IN THE MISSOURI COURT OF APPEALS
 WESTERN DISTRICT
 en banc

 RONALD WILLIAMS, )
 )
 Respondent, ) WD83835
 v. ) (Consolidated with WD83938)
 )
 ) OPINION FILED:
 CITY OF KANSAS CITY, MISSOURI, ) December 21, 2021
 )
 Appellant. )

 Appeal from the Circuit Court of Jackson County, Missouri
 The Honorable Sandra C. Midkiff, Judge

 Before: Cynthia L. Martin, Chief Judge, Presiding,
 Alok Ahuja, Mark D. Pfeiffer, Karen King Mitchell,
 Gary D. Witt, Anthony Rex Gabbert, Edward R. Ardini, Jr., Thomas N. Chapman, and
 W. Douglas Thomson, Judges, and Joseph M. Ellis and Thomas H. Newton, Senior Judges

 In this consolidated appeal, the City of Kansas City, Missouri (“City”), appeals from the

judgment entered by the Circuit Court of Jackson County, Missouri (“trial court”), following a

jury verdict in favor of Mr. Ronald Williams (“Williams”), awarding him compensatory and

punitive damages on his claims of retaliation and hostile work environment under the Missouri

Human Rights Act (“MHRA”) and attorney fees with a multiplier, expenses, and costs; and from

the order denying the City’s post-trial motions for judgment notwithstanding the verdict
(“JNOV”), new trial, and merger of compensatory damages. The City alleges error in the

admission of evidence, attorney fees award, and denial of its post-trial motions. We affirm.

 Factual and Procedural Background1

 Williams is a master electrician who was employed by the City as a maintenance electrician

from 2011 until 2017. Williams is African-American. In two Charges of Discrimination and an

amended Charge modifying the second Charge, Williams documented a pattern and practice of

pervasive and continuing racially discriminatory conduct from the fall of 2013 through the spring

of 2015 and beyond. Though none of the Charges identify a discrete act of termination, demotion,

or refusal to promote, all of the Charges collectively describe a hostile, intimidating, retaliatory

and offensive work environment.

 On May 6, 2014, Williams filed a Charge of Discrimination with the Missouri Commission

on Human Rights (“Commission”) against the City (“2014 Charge”). Williams alleged in the 2014

Charge that his troubles began after he signed a statement regarding a complaint of racial

discrimination in support of one of his former co-employees in July of 2013.2 The 2014 Charge

alleged that the discrimination he faced was “continuing” and resulted in a racially motivated and

unfair reprimand letter in October of 2013 stemming from a September 2013 workplace event.

Specifically, he charged:

 I was hired on or about June 20, 2011, as a Maintenance Electrician.

 In or about July 2013, I signed a statement regarding a complaint of race[-]based
 discrimination filed by a former Superintendent. On or about October 9, 2013, I,
 and one other black Maintenance Electrician, was issued a letter of reprimand after

 1
 “We view the facts in the light most favorable to the jury’s verdict.” Wynn v. BNSF Ry. Co., 588 S.W.3d
907, 909 n.2 (Mo. App. W.D. 2019).
 2
 This is a significant fact that the dissenting opinion discounts. For, in the 2014 Charge, immediately after
reference to Mr. Williams’s July 2013 statement, Mr. Williams details that he began to experience racially motivated
retaliation stemming from a workplace event that occurred in September 2013 and ultimately resulted in an unjustified
written reprimand in October 2013.

 2
 being observed sitting in our vehicle from 10:00 AM to 10:45 AM on or about
 September 19, 2013.

 I believe I was issued the letter of reprimand because of my race (black), and in
 retaliation for participating in the protected activity of writing a statement in
 support of another person’s complaint of discrimination, in violation of Title VII of
 the Civil Rights Act of 1964, as amended.

Ex. 201 (emphasis added). The Commission investigated Williams’s complaint and concluded

that it lacked jurisdiction because the complaint was not filed within 180 days of the alleged

discrimination as required by the MHRA. Ex. 239. Of significance to our discussion today, though

this Charge was dismissed by the Commission, the City conceded that it had notice of the express

allegations contained in the 2014 Charge and received such notice at or near the time the 2014

Charge was filed with the Commission.

 Instead of asserting any sort of challenge to the Commission’s timeliness/jurisdictional

determination as to the 2014 Charge, Williams filed a second Charge of Discrimination against

the City with the Commission on October 2, 2015 (“2015 Charge”), and incorporated his allegation

of racial discrimination from the 2014 Charge into the last sentence of the 2015 Charge when

explaining the continuing and pervasive level of discrimination he was experiencing. Specifically,

Williams again alleged that he had been discriminated against because of his race and retaliated

against. Williams detailed a pattern of racially motivated discrimination in 2014 and 2015 and

that the pattern of discrimination and retaliation was a continuing action. Williams alleged that

white employees with less experience were offered educational training courses that would

empower these white employees to be more qualified than black employees to receive job

promotions with the City that would pay those employees more than the less-trained black

employees. Williams did not focus upon one discrete action of discriminatory failure of the City

to allow him to take an educational training course; instead, he described multiple instances in

 3
which he and another black co-employee were denied access to training courses even though they

possessed more job seniority than the white employees that were selected for the training courses.

And, in conclusion, Williams reiterated that the pattern of discrimination by the City was a

continuation of its retaliatory tactics with regard to Williams’s initial act in 2013 of “opposing acts

made unlawful under Title VII of the Civil Rights Act.”3 Specifically, he charged:

 I. I was hired by [the City] on or about 6/20/11 and I am currently employed as a
 Maintenance Electrician.

 II. On or about 11/14, Maintenance Electricians, white, were selected for and
 thereafter completed an industrial motor control training course. I had more
 seniority than two of the Maintenance Electricians, as did another black
 Maintenance Electrician.

 III. I believe this is discrimination against me because of my race, black, in
 violation of Title VII of the Civil Rights Act of 1964, as amended, and retaliation
 against me for opposing acts made unlawful under Title VII of the Civil Rights Act
 of 1964, as amended.

Ex. 202 (emphasis added).

 On October 7, 2016, Williams filed an Amended Charge of Discrimination (amending the

2015 Charge) against the City with the Commission (“2016 Charge”). In the 2016 Charge,

Williams again alleged that he had been discriminated against because of his race and retaliated

against. However, in this Charge, Williams more particularly documented a discriminatory

scheme by the City to allow less senior white employees to take educational training courses

offered by the City so that the white employees could receive job promotions while the more senior

black employees were denied access to the training courses offered by the City and, consequently,

were not in an educational position to receive the same promotional opportunities as the white

 3
 This is a significant incorporation of evidence stemming from the 2014 Charge and there is little doubt that
this statement is, in fact, referencing the allegations made in the 2014 Charge; for, the only time Williams had ever
documented retaliatory actions by the City in response to his conduct of “opposing” discriminatory conduct was in
response to his act of signing a written statement opposing the City’s discrimination of his fellow employee—all of
which emanates from the complaints charged in the 2014 Charge.

 4
employees. Williams pointed out that the City’s scheme included attempting to pacify the black

employees by assuring them that more training courses would be offered by the City to the black

employees when, in fact, the City never offered such courses and Williams intimates in the 2016

Charge that he believed that the City never intended to offer the training courses to the black

employees as Williams concludes his allegations by stating that this pattern of hostility towards

Williams and his fellow black co-employees was a continuing action by the City. Specifically, he

charged:

 I have worked for the City of Kansas City, Missouri, for approximately seventeen
 years and have been in the Water Services Department for the last five years. Since
 November, 2014, when less-senior white employees were permitted to take an
 Industrial Motor Control Training Course, management has been offering to allow
 myself and other African-Americans the opportunity to take such a class. The
 White employees were paid while taking this class. Initially, we were told that
 there would be two groups taking the class. The White employees were permitted
 to take the class first. Neither myself nor any other African-Americans have been
 offered the same course. I believe that the City intended to use this class as a basis
 for reclassifying employees, as mention of a new job position of Utility Electrician
 was made and I believe this course would have been used as a qualification for that
 position. I complained to the Superintendent, Steve Berry, about the White
 employees getting to take the class and none of the African-American employees
 getting to and about wanting to talk to Human Resources about the new job
 position. After that, there has not been any more mention of the Utility Electrician
 position. Management continued to tell us that there would be a second class after
 the first group had finish[ed], it was even mentioned after I initially filed my charge.
 To this date, no second class has ever been offered.

 I believe that the City and the management at the Water Plant singled out the
 African-Americans and selected the White employees to take the class and that our
 race played a role in the decision; we had been asking to take the course for years
 prior to it being offered to the White employees. I believe this is a clear pattern and
 practice by the City of permitting White employees to receive better training than
 African-Americans, that would put the White employees in a better position for
 promotion.

Ex. 203. On April 20, 2018, the Commission issued Williams a notice of his right to sue under

the MHRA. The notice informed Williams that he must bring a civil action against the City within

ninety days of the date of the notice or his right to sue would be lost. Ex. 204.

 5
 Williams timely filed a Petition for Damages against the City on July 13, 2018. Williams

alleged a pervasive and continuing pattern and practice of discrimination that all started after he

signed a written statement of support opposing discrimination of his co-employee by the City.

Williams alleged that the discriminatory conduct began in the fall of 2013 and that the City’s

conduct was always subtle yet always designed to create an offensive workplace environment.

Williams described details about how, in 2014, the City offered an Industrial Motor Control

Training Course to the maintenance electricians of the Water Services Department but only

permitted Williams’s less qualified and less senior white co-employees to take the course.

Williams also documented the discriminatory pattern relating to the training courses by detailing

the City’s scheme to insist that additional training courses would be offered to black employees

although, in fact, none were ever offered, thereby blocking black employees from getting the

training that would have allowed them to be considered for job promotions. Williams alleged

numerous occasions where one of his supervisors stated that black electricians were incompetent;

that white employees were given preferential treatment over black employees; that less qualified

white employees were promoted over more qualified black employees; that black employees were

disciplined for identical workplace actions that white employees were never disciplined for; that

black employees were ignored by their supervisors when complaints were lodged about unfair and

discriminatory treatment; and that the City’s supervisors continued to allow the hostile and

retaliatory work environment to continue to exist for Williams and his fellow black co-employees.

Williams alleged that the ongoing and continuous pattern of harassment, discriminatory conduct,

and retaliatory conduct rendered his working conditions so intolerable that he was forced to quit

his job with the City. Williams asserted claims of discrimination based on race, illegal retaliation,

and hostile work environment, all in violation of the MHRA. L.F. Doc. 2.

 6
 The trial court conducted a jury trial January 27 through February 6, 2020. At the

conclusion of the evidence, the trial court instructed the jury on each count asserted by Williams

in his Petition. The jury returned a verdict in the City’s favor on Williams’s race discrimination

claim, but returned verdicts in Williams’s favor on his retaliation and hostile work environment

claims. On the retaliation claim, the jury assessed compensatory damages at $160,000 and punitive

damages at $126,000; on the hostile work environment claim, the jury assessed compensatory

damages at $126,000 and punitive damages at $378,000.

 On March 9, 2020, the City filed three post-trial motions: Motion for JNOV, Motion for

New Trial, and Motion for Merger of Compensatory Damages. On May 20, 2020, the trial court

entered an order denying each motion. On May 22, 2020, the trial court entered its Final Judgment

and Order on the jury’s verdicts and also awarded Williams $474,456.25 in attorneys’ fees,

including a 1.5 multiplier, and $4,720 in expenses and costs. On June 1, 2020, the City filed

renewed post-trial motions for JNOV, new trial, and merger of compensatory damages, and an

additional motion for new trial. The trial court entered an order denying the motions on July 27,

2020.

 On June 9, 2020, the City timely appealed from the May 22, 2020 judgment, which appeal

was assigned case number WD83835. On July 30, 2020, the City timely appealed from both the

May 22, 2020 judgment and the July 27, 2020 order, which appeal was assigned case number

WD83938. By written order dated July 30, 2020, this Court consolidated the appeals under case

number WD83835.

 Points on Appeal

 The City asserts nine points on appeal. In Point I, the City contends that the trial court

erred in denying the City’s motion for JNOV because the City proved its affirmative defense of

 7
failure to exhaust administrative remedies in that the charges of discrimination filed with the

Commission did not contain a claim of hostile work environment. In Points II, III, IV, V, and VI,

the City asserts instructional error. In Point VII, the City asserts trial court error in the admission

of evidence. In Point VIII, the City contends that the trial court erred in denying the City’s motion

to merge the compensatory damage verdicts for retaliation and hostile work environment. Finally,

in Point IX, the City avers that the trial court erred in awarding Williams attorney fees with a 1.5

multiplier. Additional facts necessary to the resolution of the issues on appeal will be discussed

below. Similar points will be addressed together.

 Analysis

 Point I

 In the City’s first point, it asserts that the trial court erred in denying its motion for JNOV

because it proved its affirmative defense of failure to exhaust administrative remedies in that the

charges of discrimination filed with the Commission did not contain a claim of hostile work

environment.

 Standard of Review

 “‘The standard of review of the denial of a JNOV is essentially the same as the overruling

of a motion for directed verdict.’” Darks v. Jackson Cnty., 601 S.W.3d 247, 254 (Mo. App. W.D.

2020) (quoting W. Blue Print Co., LLC v. Roberts, 367 S.W.3d 7, 14 (Mo. banc 2012)). “‘A case

may not be submitted unless each and every fact essential to liability is predicated upon legal and

substantial evidence.’” Id. (quoting Moore v. Ford Motor Co., 332 S.W.3d 749, 756 (Mo. banc

2011)). “Whether a plaintiff has made a submissible case is a question of law subject to de novo

review, . . . but the evidence is viewed in the light most favorable to the result reached by the jury,

giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and

 8
inferences that conflict with that verdict.” Id. (citation omitted) (internal quotation marks omitted).

“Indeed, ‘[t]he jury’s verdict will be reversed only if there is a complete absence of probative facts

to support the jury’s conclusion.’” Id. (quoting Keveney v. Mo. Military Acad., 304 S.W.3d 98,

104 (Mo. banc 2010)). “We will only reverse a trial court’s denial on a motion for JNOV or

directed verdict if either the plaintiff has not made a submissible case or the defendant establishes

an affirmative defense as a matter of law.” Payne v. Fiesta Corp., 543 S.W.3d 109, 126 (Mo. App.

E.D. 2018) (emphasis added). Here, the City does not assert that Williams has not made a

submissible case; instead, the City contends that it established its affirmative defense as a matter

of law.

 Preservation of Error

 As a threshold issue, Williams argues that the City waived its affirmative defense on the

hostile work environment claim by not properly pleading it in its First Amended Answer.

 For background, Williams has consistently objected to the City’s pleading on this

affirmative defense on the grounds that the City’s affirmative defense lacks the required “factual

basis” in support of the defense. In response to the City’s original Answer to Williams’s Petition,

Williams moved to strike the affirmative defense allegation for failing to include a factual basis,

thereby rendering the alleged affirmative defense nothing more than conclusory statements. In

particular, Williams argued in his motion to strike:

 Failure to exhaust administrative remedies is not specifically listed in Rule 55.08,
 but it is, nevertheless, an affirmative defense that Defendant must plead. See
 McCracken v. Wal-Mart Stores East, LP, 298 S.W.3d 473, 477 (Mo. banc 2009);
 Evans v. Empire Dist. Electric Co., 346 S.W.3d 313, 316 (Mo. App. W.D. 2011);
 and Kerr v. Mo. Veterans Comm’n, 537 S.W.3d 865, 875 (Mo. App. W.D. 2017).

 Pursuant to Rule 55.08 an affirmative defense must “contain a short and plain
 statement of the facts showing that the pleader is entitled to the defense.” (emphasis
 added). “The factual basis for an affirmative defense must be presented in the same
 manner as is required for pleading claims under the Missouri Rules of Civil

 9
 Procedure.” American First Federal v. Battlefield Ctr., 282 S.W.3d 1, 7 (Mo. App.
 E.D. 2009). To properly assert an affirmative defense, Defendant must “clearly
 and precisely [assert] additional facts which serve to avoid the defendant’s legal
 responsibility.” Id. “A pleading that . . . does not plead the specific facts required
 to support the affirmative defense fails to adequately raise the alleged affirmative
 defense, and the alleged affirmative defense fails as a matter of law.” Ditto, Inc. v.
 Davids, 457 S.W.3d 1, 15 (Mo. App. W.D. 2014).

L.F. Doc. 44, at 3-4. In response, the trial court granted Williams’s motion to strike and, in

pertinent part, stated that the City’s affirmative defense pleadings:

 fail to fulfill the requirements of Mo.R.Civ.P. 55.08 in that these paragraphs fail to
 “contain a short and plain statement of the facts showing that the pleader is entitled
 to the defense.” The Defendant has failed here to clearly and precisely state facts
 which serve to avoid the defendant’s legal responsibility. A pleading that does not
 plead the specific facts required to support the affirmative defense fails to
 adequately raise the alleged affirmative defense, and it fails as a matter of law.
 Ditto, Inc. v. Davids, 457 S.W.3d 1, 15 (Mo. App. W.D. 2014). Defendant’s
 allegations are conclusory at best . . . .

L.F. Doc. 60, at 2. Knowing that its previous affirmative defense pleadings were stricken, in part,

because of the failure to “clearly and precisely state facts” in support thereof, after seeking and

receiving leave of the trial court to file an amended responsive pleading, the City included two

failure-to-exhaust affirmative defenses in its First Amended Answer, one of which related to

constructive discharge:

 81. Plaintiff voluntarily resigned his employment with the City in January 2017.
 He cannot maintain any claim of constructive discharge because such a claim has
 not been exhausted with the Missouri Commission on Human Rights, and could not
 have been exhausted, prior to filing suit. When Plaintiff filed his Charge of
 Discrimination and Amended Charge of Discrimination, he was still employed by
 the City and there were no allegations in the Charge of Discrimination or Amended
 Charge of Discrimination that would have put the City on notice that Plaintiff was
 bringing a claim of constructive discharge. (RSMo. § 213.075).

L.F. Doc. 62, ⁋ 81. The other failure-to-exhaust affirmative defense stated:

 78. Plaintiff’s Charge of Discrimination and Amended Charge of Discrimination
 only serve to exhaust claims that are related to the City’s offering of the Industrial
 Motor Control Training Course. Any of the factual allegations in Plaintiff’s
 Petition which do not pertain to the particulars included in his Charge of

 10
 Discrimination and Amended Charge of Discrimination have not been adequately
 exhausted prior to filing suit as required by the MHRA (RSMo. § 213.075 and
 § 213.111) and related case law.

L.F. Doc. 62, ⁋ 78. Thus, unlike the affirmative defense relating to the constructive discharge

claim (i.e., specific factual allegation that Williams was still employed by the City at the time of

the constructive discharge Charge of Discrimination), in the affirmative defense relating to the

hostile work environment claim, the City paints with a broad legal and factual brush that ignores

express language contained within the actionable charges of discrimination that, ironically, it seeks

to criticize for its lack of particularity and, in so doing, requires the reader of the City’s affirmative

defense to speculate as to what language from the actionable charges of discrimination the City is

criticizing in its affirmative defense and search elsewhere in the City’s eighteen-page amended

pleading to attempt to appreciate what the City is arguing in its affirmative defense.

 For example, is the City attempting to assert that the 2014 Charge allegations (which it

concedes it had notice of) may not be considered as factual allegations relating to the hostile work

environment claim even though the 2014 Charge is incorporated and included as factual allegations

supporting the 2015 Charge in the last sentence? If so, how does the City explain in its affirmative

defense why it is legally entitled to ignore the last sentence from the 2015 Charge that clearly

refers to Williams’s 2014 Charge allegation of “opposing” the City’s discriminatory action as to

his work colleague? Which of Plaintiff’s “factual allegations in Plaintiff’s Petition” do not

“pertain” to Williams’s actionable charges of discrimination? Specifically, for example, which of

Plaintiff’s “factual allegations in Plaintiff’s Petition” do not pertain to discriminatory actions taken

against Williams for “opposing acts made unlawful under Title VII of the Civil Rights Act of 1964,

as amended” (i.e., Williams “opposed” discriminatory misconduct towards his fellow employee in

July 2013 when he signed a statement “opposing” such discriminatory misconduct in support of

 11
his co-employee’s claim of discrimination against the City)? Likewise, is the City claiming that

accusations of “incompetence” of black employees do not “pertain” to a Charge that black

employees are pervasively, intentionally, and continuously denied access to the City’s training

courses? Is the City claiming that allegations of discriminatory complaints by Williams falling on

deaf ears with City supervisors do not “pertain” to the City ignoring the requests of Williams and

his fellow black co-employees requesting remedial steps to correct the hostile and retaliatory

workplace environment? We can’t know precisely what the City intends by this affirmative

defense because the City simply has failed to articulate what “factual allegations” of the Plaintiff’s

Petition “pertain,” or do not “pertain,” to the actionable charges of discrimination Williams filed.

 What we do know is that at or about the same time the City filed its Amended Answer, it

also filed its motion for summary judgment relating to the exhaustion of remedies defense. Once

again, Williams responded with objections to the affirmative defense as constituting nothing more

than “bare assertion[s],” L.F. Doc. 88, at 20, to support its “conclusory statements” of legal

responsibilities, L.F. Doc. 88, at 21. Williams’s response demonstrated the City’s disregard for its

legal responsibility to clearly and precisely state facts in support of its affirmative defense in any

of its pleadings. Instead, as Williams argued, the City improperly attempted to shift the burden

upon Williams to guess what facts the City was relying upon to support its affirmative defense and

to independently come forward with facts to disprove the City’s unidentified facts. L.F. Doc. 88,

at 16. We also know that the trial court was similarly unimpressed when it stated in its Order

overruling the City’s motion for summary judgment that “[t]here is no factual showing that

plaintiff has failed to satisfy the requirements of Sec. 213.075.” L.F. Doc. 131, at 2. The trial

court went on in its Order to state:

 What is clear, however, is that Mr. Williams raise[s] allegations which included
 preferential treatment of white employees in training and promotional

 12
 opportunities; that the acts complained of are part of an ongoing and continuous
 pattern or practice of discrimination and/or retaliation by Defendant; and that
 Defendant has created a hostile work environment . . . .

L.F. Doc. 131, at 3. We agree with the trial court that the City, though warned by the trial court,

has continuously failed to meet its affirmative defense pleading obligations.

 Rule 55.08 requires a party to “set forth all applicable affirmative defenses” by providing

“a short and plain statement of the facts showing that the pleader is entitled to the defense.” “Bare

legal assertions are insufficient to plead an affirmative defense.” Mo. Landowners All. v. Grain

Belt Express Clean Line LLC, 561 S.W.3d 39, 44 (Mo. App. W.D. 2018) (internal quotation marks

omitted). “Where a party pleads only conclusory statements without pleading the specific facts

required to support the affirmative defense, the party has failed to adequately raise the affirmative

defense, and it fails as a matter of law.” Id. “The purpose of this rule is ‘to ensure that an opposing

party is informed of and prepared to address the issues being raised by the defense.’” Id. (quoting

Dieser v. St. Anthony’s Med. Ctr., 498 S.W.3d 419, 429 (Mo. banc 2016)).

 Simply put, the City’s affirmative defense pleading in its Answer, and later, Amended

Answer is nothing more than a conclusory statement of bare legal assertions that both ignores

express language contained within the actionable charges of discrimination and fails to plead

specific facts required to support its affirmative defense.

 Similarly, the City failed to preserve its claimed error relating to this affirmative defense

in that its motion for directed verdict lacked specificity and, thus, preserved nothing for appeal,

Pope v. Pope, 179 S.W.3d 442, 450-51 (Mo. App. W.D. 2005), and this failure renders a

subsequent motion for judgment notwithstanding the verdict without basis and, likewise, preserves

nothing for appeal. Mansfield v. Horner, 443 S.W.3d 627, 638 (Mo. App. W.D. 2014). Point I

fails for this reason alone.

 13
 However, because the dissenting opinion chooses to liberally construe4 the City’s

unpreserved affirmative defense in contravention of Rule 55.08 and cases interpreting Rule 55.08

and cited above, we will address, arguendo, other shortcomings of the City’s argument on Point I

as it relates to the City’s position that it has substantively proven its affirmative defense below as

a matter of law.

 Analysis

 Before a claimant under the MHRA files suit in the circuit court, he is required to file a

verified complaint with the Commission “in order to give the agency the opportunity to determine

the validity of the claim, to investigate, and to determine if there is probable cause that

discrimination has taken place.” Kerr v. Mo. Veterans Comm’n, 537 S.W.3d 865, 874 (Mo. App.

W.D. 2017) (internal quotation marks omitted). “The purpose of requiring parties to file a charge

of discrimination is to give the charged party notice of the claim, to give the [investigating agency]

the opportunity to settle the dispute, and to narrow the issues for prompt adjudication.” Id. at 875

(internal quotation marks omitted). “In order to exhaust all administrative remedies, the claimant

must give notice of all claims in the administrative complaint.” Kerr, 537 S.W.3d at 874 (internal

quotation marks omitted).

 Although exhaustion requires a claimant to give notice of all claims of discrimination in

the administrative complaint, “‘administrative complaints are interpreted liberally in an effort to

further the remedial purposes of legislation that prohibits unlawful employment practices.’”

Farrow v. Saint Francis Med. Ctr., 407 S.W.3d 579, 594 (Mo. banc 2013) (quoting Alhalabi v.

 4
 It is ironic and disconcerting that the dissenting opinion chooses to liberally construe the City’s affirmative
defense where Missouri is a fact pleading state and not a notice pleading state, see ITT Com. Fin. Corp. v. Mid-Am.
Marine Supply Corp., 854 S.W.2d 371, 379 (Mo. banc 1993) (“Missouri is not a ‘notice pleading’ state.”); State ex rel.
Harvey v. Wells, 955 S.W.2d 546, 547 (Mo. banc 1997) (“The Missouri rules of civil procedure require fact
pleading.”)—and yet, the dissenting opinion refuses to liberally construe Williams’s actionable charges of
discrimination even where our Missouri Supreme Court has mandated that we must do so. Farrow v. Saint Francis
Med. Ctr., 407 S.W.3d 579, 594 (Mo. banc 2013).

 14
Mo. Dep’t of Nat. Res., 300 S.W.3d 518, 525 (Mo. App. E.D. 2009)). “‘As a result, administrative

remedies are deemed exhausted as to all incidents of discrimination that are like or reasonably

related to the allegations of the administrative charge.’” Kerr, 537 S.W.3d at 874 (quoting

Alhalabi, 300 S.W.3d at 525). “A claim is ‘like or reasonably related’ to the . . . charge [of

discrimination] . . . if there is a factual relationship between them.” Id. at 875 (internal quotation

marks omitted). When determining whether the claims in a subsequent civil suit are “like or

reasonably related” to the allegations contained in the administrative charge, our Supreme Court

has held that “‘the scope of the civil suit may be as broad as the scope of the administrative

investigation which could reasonably be expected to grow out of the charge of discrimination.’”

Farrow, 407 S.W.3d at 594 (quoting Alhalabi, 300 S.W.3d at 525).

 “‘[A]n affirmative defense seeks to defeat or avoid a plaintiff’s cause of action, and alleges

that even if plaintiff’s petition is true, plaintiff cannot prevail because there are additional facts

that permit the defendant to avoid legal responsibility.’” Lehman v. Auto. Invs., LLC, 608 S.W.3d

733, 738 (Mo. App. E.D. 2020) (quoting Templeton v. Cambiano, 558 S.W.3d 101, 104 (Mo. App.

W.D. 2018)). “Defendants carry the burden of proof on all affirmative defenses.” Id. (internal

quotation marks omitted). For the City to prove that Williams’s hostile work environment claim

was not exhausted, the City had the burden to establish that: (1) Williams’s administrative

complaint did not give the City notice of the hostile work environment claim; and (2) the hostile

work environment claim was not like or reasonably related to the allegations of the administrative

charge in that there was no factual relationship between them. The City cannot meet either of

these elements of proof.

 In evaluating this premise, it is important to note what the City is not arguing. First, the

City is not arguing that it did not have notice of Williams’s 2014 Charge and, instead, concedes

 15
that it had notice of the 2014 Charge at or near the time the 2014 Charge was filed with the

Commission. Specifically, then, the City was aware that when Williams opposed the City’s racial

discrimination of one of his co-employees and he took the step to write and sign a statement of

support for his co-employee’s discrimination claim, Williams alleged that the City began to turn

its focus on discriminating and retaliating against him by way of unfair reprimands.

 Next, the City does not argue that, had Williams merely re-stated verbatim the exact text

of his 2014 Charge as part of his 2015 Charge, the City could have pursued its current affirmative

defense claim. Instead, at oral argument of this appeal, the City’s counsel conceded that if

Williams had re-stated the text of his 2014 Charge in his 2015 Charge:

 I believe that’s what the Alhalabi5 case says, “I had other complaints, they were
 older all of those I’m complaining about again.” Yeah, yeah, I think if that’s in [the
 2015 Charge or 2016 Charge] then [the City] wouldn’t be here saying that that’s
 not exhausted.6

 And, the City does not take the position that it knows what the last sentence of the 2015

Charge means, only that it does not know what it refers to and should not thus be placed on notice

of what that sentence may reasonably be referring to. For multiple reasons, herein lies the fatal

flaw of the City’s purported affirmative defense.

 First, a reasonable—let alone liberal—construction of the 2015 Charge is that Williams

has incorporated by reference his 2014 Charge.

 Alhalabi v. Mo. Dep’t of Nat. Res., 300 S.W.3d 518 (Mo. App. E.D. 2009), discussed infra.
 5

 We presume that the City is referring to and recognizing the “continuing violation” theory on Missouri
 6

Commission on Human Rights (“MCHR”) complaints:

 Under the “continuing violation” theory, a plaintiff may pursue a claim for an event that occurred
 prior to the 180-day statute of limitations for filing a claim of discrimination with the MCHR if the
 plaintiff can demonstrate that the event is part of an ongoing practice or pattern of discrimination
 by the employer.

Tisch v. DST Sys., Inc., 368 S.W.3d 245, 252 (Mo. App. W.D. 2012) (internal quotation marks omitted).

 16
 The 2014 Charge documents Williams writing a statement of support for a fellow employee

who was being racially discriminated against by the City; then, Williams alleges that he suffers

from an unfair reprimand by the City; and then, Williams specifically alleges that the reason for

the City’s conduct is in retaliation “for participating in the protected activity of writing a statement

of support of another person’s complaint of discrimination, in violation of Title VII of the Civil

Rights Act.” In so doing, Williams has effectively detailed his opposition to racial discrimination

against his fellow employee by signing a statement of “support” for his co-employee which led to

discriminatory misconduct by the City towards Williams. Importantly, the City admits in its

Amended Answer that “the 2014 Charge of Discrimination raises similar issues of race

discrimination, retaliation, and hostile work environment.” L.F. Doc. 62, ⁋ 79(b) (emphasis

added).7

 Then, in the 2015 Charge—after detailing additional instances of discriminatory practices

implemented by the City in discriminating against Williams and his fellow black co-employees as

it related to training opportunities (or lack thereof for black employees)—Williams states in the

last sentence of his 2015 Charge:

 I believe this [i.e., multiple acts of training discrimination to black employees] is
 discrimination against me because of my race, black, in violation of Title VII of the
 Civil Rights Act of 1964, as amended, and retaliation against me for opposing acts
 made unlawful under Title VII of the Civil Rights Act of 1964, as amended [i.e.
 opposing the City’s racial discrimination in his written letter of support for his
 fellow black co-employee].

 7
 The dissenting opinion contends that there is nothing about the 2014 Charge that raises the issue of a hostile
work environment. Not only is this suggestion misleading, it is clearly not an argument raised by the City in this
appeal. “An appellate court’s role is to review specifically challenged trial court rulings, not to sift through the record
to detect possibly valid arguments.” Geiler v. Liberty Ins. Corp., 621 S.W.3d 536, 547 (Mo. App. W.D. 2021) (internal
quotation marks omitted). “This narrow role reflects the interwoven policy interests governing appellate review,
including the reviewing court’s duty not to act as advocate for any party; the efficient use of judicial resources; notice
and fairness to the parties; judicial decision-making based on fully-briefed issues; and the law’s preference for finality
of judgments.” Id. (internal quotation marks omitted).

 17
(Emphasis and bracketed phrasing added). Since the only act in which Williams had “opposed”

discrimination was from the 2014 Charge, how can it reasonably be said that Williams has not

incorporated his 2014 Charge into his 2015 Charge? At bare minimum, if read “liberally,” as we

are required to do, it simply cannot be said that Williams was not placing the City on notice that

he believed the City’s earlier discriminatory misconduct—when combined with the numerous

training schemes designed by the City to keep Williams and his fellow black employees from

ascending to a higher stature of employment—was part of a deliberate attempt to create a pervasive

racially discriminatory and offensive work environment that would force Williams to leave (i.e., a

hostile work environment).

 Second, even if the last sentence of the 2015 Charge is somehow construed to not refer

back to Williams’s opposition to the City’s racial discrimination of his co-employee and written

statement in support of such co-employee, the scope of any reasonable administration investigation

of the last sentence would invariably lead the Commission right back to the 2014 Charge

allegations, allegations which the City admits raises the “issues of race discrimination, retaliation,

and hostile work environment.” L.F. Doc. 62, ⁋ 79(b) (emphasis added). In that event, much like

the Court in Alhalabi v. Missouri Department of Natural Resources, 300 S.W.3d 518, 526 (Mo.

App. E.D. 2009), we must end up in the same place: that Williams’s 2015 Charge (as amended

by the 2016 Charge) has adequately pled facts placing the City on notice of a hostile work

environment claim.

 In Alhalabi, Mr. Alhalabi (“employee”) filed a timely charge of discrimination with the

Commission, which issued employee a notice of his right to sue. Id. at 524. Employee filed a

petition for employment discrimination in violation of the MHRA against his employer. Id. After

a trial, the jury found in favor of the employer on employee’s discrimination and retaliation claims

 18
against it. Id. However, the jury found in favor of employee on his hostile work environment

claim. Id. Employer subsequently filed a motion for JNOV or, in the alternative, for a new trial,

which was denied. Id. Employer appealed, arguing that the trial court erred in entering its

judgment because employee failed to exhaust his administrative remedies as required under the

MHRA. Id.

 The Alhalabi court noted that the Missouri Supreme Court takes a liberal approach to the

fulfillment of procedural requirements under the MHRA, citing Hill v. Ford Motor Co., 277

S.W.3d 659, 670 (Mo. banc 2009), where the Court noted the importance of “the availability of

complete redress of legitimate grievances without undue encumbrance by procedural requirements

especially [in cases where] demanding full and technical compliance would have no relation to the

purposes for requiring those procedures in the first instance.” According to the Alhalabi court,

“exhaustion requires a claimant to give notice of all claims of discrimination in the administrative

complaint, but administrative complaints are interpreted liberally in an effort to further the

remedial purposes of legislation that prohibits unlawful employment practices.” Alhalabi, 300

S.W.3d at 525.

 The facts of Alhalabi are strikingly similar to the present case. In Alhalabi, the employee’s

charge of Discrimination described two incidents of reprimands based upon racial discrimination,

generally “allude[d] to previous complaints” about discrimination which led to the employee being

harshly targeted and disciplined, and the employee “checked the box on the Charge of

Discrimination form signifying the discriminatory conduct was continuing, and [employee] listed

a span of over two years . . . on which the discrimination took place.” Id. at 526. The Eastern

District of this Court concluded:

 Unlike in cases where there was a discrete act of discrimination, Alhalabi’s Charge
 of Discrimination describes pervasive racially discriminatory conduct. Racial

 19
 discrimination creates a hostile work environment when discriminatory conduct
 either creates an intimidating, hostile, or offensive work environment or has the
 purpose or effect of unreasonably interfering with an individual’s work
 performance. See Hill, 277 S.W.3d at 666. In most claims of hostile work
 environment harassment, the discriminatory acts are not of a nature that can be
 identified individually as significant events; instead, the day-to-day harassment is
 primarily significant, both as a legal and as a practical matter, in its cumulative
 effect. Pollock v. Wetterau Food Distribution Group, 11 S.W.3d 754, 763 (Mo.
 App. E.D. 1999). We find in this case Alhalabi’s Charge of Discrimination
 adequately alleges a claim for a hostile work environment.

Id. Here, Williams’s 2015 and 2016 Charges of Discrimination are virtually identical in substance

as that of Alhalabi. Williams documents in his Charges that, after “opposing acts made unlawful

under Title VII of the Civil Rights Act,” he was retaliated against by way of racially motivated

discipline; Williams alleged racially motivated denied opportunities for training that had been

going on for years, alleged it was a “pattern” of choosing less qualified white employees over

African-American employees, and that the discriminatory training scheme went so far as to include

illusory and false promises of additional training courses for Williams and his fellow black

co-employees when, in fact, no such additional training courses were ever offered at any time to

Williams or his fellow black co-employees; and Williams checked the box on each of his Charges

of Discrimination forms signifying that the discriminatory conduct was continuing and had lasted

for years—from the fall of 2013 through the spring of 2015 and beyond. Hence, as in Alhalabi,

we similarly conclude that Williams’s actionable Charges of Discrimination adequately alleged a

claim for a hostile work environment.

 Additionally, the Alhalabi court identified an alternative basis for judging the adequacy of

the employee’s charge of discrimination and his corresponding hostile work environment claim,

stating:

 even if we assume for argument’s sake that Alhalabi’s charge of discrimination
 does not set forth a claim for a hostile work environment, it is likely that the scope
 of the administrative investigation which could reasonably be expected to grow

 20
 out of the charge of discrimination would include an investigation of whether
 Alhalabi was employed in a hostile work environment. Thus, the charge of
 discrimination would be adequate to raise the claim in this case.

Id. (emphasis added). Here, again, the same is true. Even if we were to assume for argument’s

sake that, as the City argues, Williams’s 2015 and 2016 charges of discrimination do not set forth

a claim for a hostile work environment, it is reasonable to expect that any administrative

investigation growing out of the 2015 and 2016 Charges of “continuing” discrimination would

include an investigation of what Williams meant by the second half of his last sentence in his 2015

Charge: that Williams was also being retaliated against by the City for “opposing acts” of

discrimination by the City—where no such “opposition” is described anywhere previously in the

2015 Charge. This investigation, if reasonably performed, would surely lead back to the 2014

Charge and the corresponding allegations of discrimination in that Charge. And, in so doing, the

Commission would have been alerted—as would the City—to a bigger pattern of discrimination

alleged by Williams that spanned years, not months.

 Similar to Alhalabi, Williams failed to use the explicit phrase “hostile work environment”

in his administrative charge. However, regardless of whether Williams’s actionable charges of

discrimination alleged a hostile work environment claim, the critical question for this Court is

“whether the claims set forth in [Williams’s] petition were within the scope of the administrative

investigation which ‘could reasonably be expected to grow’ out of his administrative charge.”

Jeffery v. St. Louis Fire Dep’t, 506 S.W.3d 394, 400 (Mo. App. E.D. 2016) (quoting Alhalabi, 300

S.W.3d at 525). The City argues that Williams’s allegations in his administrative charges “solely

relate to training and a specific promotion.” But, in doing so, the City ignores the last sentence of

the 2015 Charge—while simultaneously conceding that if that sentence is designed to refer back

to Williams’s “opposition” to the City’s alleged discrimination of his co-employee and the events

 21
that transpired after he “opposed” the City’s discrimination—then the City’s affirmative defense

fails.

 More importantly, the City offers no suggestion that it was never apprised of Williams’s

“continuing” allegations of discrimination that dated back to the 2014 Charge; to the contrary, it

is uncontested that the City received the 2014 Charge of Discrimination allegations in addition to

the 2015 and 2016 Charges of Discrimination. And, if the principle that “administrative

complaints are to be interpreted liberally,” Farrow, 407 S.W.3d at 594, is to be balanced with the

notion that the purpose of an administrative charge is to “give the charged party notice of the

claim,” Kerr, 537 S.W.3d at 875, can the City, like the employer in Farrow, honestly claim that

“[t]he first time [the City] was apprised of [the factual allegations of the 2014 Charge],” Farrow,

407 S.W.3d at 594, was when Williams filed his lawsuit?8 Of course not. Instead, it is clear from

the record that the City was well aware of the 2014 Charge allegations of discrimination (both by

seeing those allegations when first made in 2014 and when reiterated in the 2015 Charge)

described by Williams in his actionable administrative charges that ultimately were mirrored in

Williams’s lawsuit against the City.

 “Racial discrimination creates a hostile work environment when ‘discriminatory conduct

either creates an intimidating, hostile, or offensive work environment, or has the purpose or effect

of unreasonably interfering with an individual’s work performance.’” McGaughy v. Laclede Gas

 8
 In Farrow, the Supreme Court concluded that the claimant was limited to “the events that occurred prior to
her December 2008 discharge,” and could not include additional allegations of discrimination that she suffered from
after her discharge, because the employer had no notice of those allegations (in the form of an administrative Charge
of Discrimination) until the claimant filed the lawsuit. Farrow, 407 S.W.3d at 594. Here, conversely, the City
concedes that Williams has not attempted to assert allegations in his petition that post-dated his separation from
employment with the City and that the City was well aware of the allegations contained in the 2014 Charge because
it had received a copy of the 2014 Charge upon its filing with the Commission; more importantly, Williams referenced
back to the 2014 Charge in the last sentence of the 2015 Charge—again placing the City on notice of his intent to
pursue a claim arising out of the cumulative effect of both the 2014 and 2015 “continuous action” discriminatory
charges.

 22
Co., 604 S.W.3d 730, 748 (Mo. App. E.D. 2020) (quoting Alhalabi, 300 S.W.3d at 526). It cannot

fairly be suggested that the City was not well aware and otherwise placed on notice of Williams’s

hostile work environment claims via the actionable administrative charges of discrimination

Williams filed prior to filing the underlying lawsuit against the City. “Accordingly, [Williams]

exhausted his available administrative remedies prior to filing his petition in the circuit court.”

Jeffery, 506 S.W.3d at 400.

 The City has (1) failed to preserve its affirmative defense claim for appellate review, and

(2) alternatively, failed to prove its affirmative defense as a matter of law; consequently, the trial

court did not err in denying the City’s motion for JNOV.

 Point I is denied.

 Standard of Review for Points II, III, IV, V, and VI

 “Review of the trial court’s denial of a motion for new trial is for an abuse of discretion.”

TooBaRoo, LLC v. W. Robidoux, Inc., 614 S.W.3d 29, 42 (Mo. App. W.D. 2020) (citing St. Louis

Cnty. v. River Bend Ests. Homeowners’ Ass’n, 408 S.W.3d 116, 134 (Mo. banc 2013)). The trial

court abuses its discretion when its ruling is clearly against the logic of the circumstances before

it at the time and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a

lack of careful consideration. Id. “We view the evidence in the light most favorable to the trial

court’s ruling.” Id.

 Points II and IV

 Because the City’s second and fourth points raise identical issues, we address them

together. In the City’s second point, it contends that the trial court erred in denying the City’s

Motion for New Trial because Instruction No. 12 misdirected, misled, or confused the jury in that

the instruction contained disjunctive alternatives that were not properly exhausted before the

 23
Commission. Likewise, in the City’s fourth point, it asserts that the trial court erred in denying

the City’s Motion for New Trial because Instruction No. 16 misdirected, misled, or confused the

jury in that the instruction contained disjunctive alternatives that were not exhausted in the charges

of discrimination filed with the Commission.

 Analysis

 The City argues in its second point that Paragraph Second in Instruction No. 12, the verdict

director submitted to the jury on Williams’s claim for retaliation, contained unexhausted conduct

that was not reasonably related to Williams’s claims regarding the offering of the Industrial Motor

Control Training Course. The instruction read:

 INSTRUCTION NO. 12

 On plaintiff’s claim for retaliation, your verdict must be for plaintiff and
 against defendant City of Kansas City, Missouri, if you believe:

 First, plaintiff complained of discrimination or harassment that he
 reasonably and in good faith believed was based on race to the Defendant’s EEO
 department in 2013 and/or filed charges of discrimination during his employment,
 and/or verbally complained of race discrimination to Steve Berry, and

 Second, defendant either:
 Treated Plaintiff as if he were incompetent, or
 Accused Plaintiff of not completing or performing work in an
 unsatisfactory manner, or
 Denied plaintiff promotions to the Electrical Maintenance
 Supervisor positions that were awarded to James Crawford
 and/or Cornell Ragland, or
 Denied plaintiff the opportunity to attend the 2014-2015 pilot
 electrical training class, or
 Accused plaintiff of sleeping on the job, and

 Third, one or more of plaintiff’s complaints of discrimination or harassment
 based on race was a contributing factor in such action, and

 Fourth, as a direct result of such conduct, Plaintiff sustained damage.

 24
L.F. Doc. 149, at 17. The City argues in its fourth point that Paragraph First in Instruction No. 16,

the verdict director submitted to the jury on Williams’s claim for hostile work environment,

contained unexhausted conduct that was not reasonably related to Williams’s claims regarding the

offering of the Industrial Motor Control Training Course. The instruction read:

 INSTRUCTION NO. 16

 On plaintiff’s claim for hostile work environment, your verdict must be for
 plaintiff and against defendant City of Kansas City, Missouri, if you believe:

 First, defendant subjected plaintiff to unwelcome harassment in any of the
 following respects:
 Subjecting plaintiff to unfair discipline when he was attempting to fix the
 megger in 2013, or
 Denying plaintiff an impartial and fair investigation into his complaints of
 discrimination, or
 Accusing plaintiff of sleeping on the job, or
 Denying plaintiff the opportunity to attend the 2014-2015 pilot electrical
 training course, or
 Allowing plaintiff to be treated by his supervisors as if he were incompetent,
 or
 Denying plaintiff promotions to the Maintenance Electrician Supervisor
 positions in 2015 where Cornell Ragland and/or James Crawford were promoted
 instead, or
 Giving plaintiff dangerous and/or undesirable work assignments in the lime
 vats and/or the secondary plant, or
 Confining plaintiff to the secondary plant with no mobility between the
 years of 2013-2015, or
 Failing to provide plaintiff access to the parts and/or information plaintiff
 needed to perform his job duties, and

 Second, that plaintiff’s race was a contributing factor in such conduct as
 you find in paragraph First, and

 Third, that such conduct either:
 Created an intimidating, hostile, or offensive work environment, or
 Had the purpose or effect of unreasonably interfering with plaintiff’s work
 performance, and

 Fourth, Defendant knew or should have known of the conduct and failed to
 respond with appropriate remedial action, and

 Fifth, as a direct result of such conduct, plaintiff sustained damage.

 25
L.F. Doc. 149, at 21-22. The City contends that eight of the allegations in Paragraph First were

unexhausted, except the allegation that the City denied Williams “the opportunity to attend the

2014-2015 pilot electrical training course.” For reasons itemized in our discussion of Point I, the

City’s exhaustion of remedies affirmative defense has not been preserved for appellate review and

the same applies here, resulting in denial of Points II and IV on this basis. However, since the

dissenting opinion has concluded that the City’s affirmative defense is preserved for appellate

review, we also address the shortcomings of the City’s substantive arguments as to its affirmative

defense, arguendo.

 Whether a jury was properly instructed is a question of law subject to de novo review.

Williams v. Mercy Clinic Springfield Communities, 568 S.W.3d 396, 413 (Mo. banc 2019).

Instructional error is grounds for reversal only when the instruction misdirected, misled, or

confused the jury and resulted in prejudice that materially affected the merits of the case. Id. Our

review is conducted in the light most favorable to the submission of the instruction. Id.

 Much like its Point I, the City argues that Williams’s claims in his actionable administrative

charges of discrimination were limited to the electrical training course and the promotion to Utility

Electrician. The City contends that the charges of discrimination contained no allegations that

would have put the City on notice that Williams intended to raise claims: (1) regarding retaliation

for the City’s alleged treatment of him as incompetent, accusing him of not completing work or

completing work unsatisfactorily, denying him a promotion to Electrical Maintenance Supervisor,

or accusing him of sleeping on the job (Point II); or (2) regarding hostile work environment for

the City’s conduct alleged in the eight challenged allegations (Point III). See Ex. 202 & 203.

 The only evidence the City relies on to support its defense that Williams failed to exhaust

his administrative remedies by not raising the disjunctive alternatives in Instruction No. 12 and

 26
Instruction No. 16 with the Commission was Williams’s responses to questions posed by the City

during its offer of proof to establish its exhaustion defense. Williams was questioned regarding

specific words Williams “mentioned” or did not “mention” in the charges.

 As we discussed in our analysis of the City’s first point, although “‘exhaustion requires a

claimant to give notice of all claims of discrimination in the administrative complaint, . . .

administrative complaints are interpreted liberally in an effort to further the remedial purposes of

legislation that prohibits unlawful employment practices.’” Kerr, 537 S.W.3d at 874 (quoting

Alhalabi, 300 S.W.3d at 525). “‘As a result, administrative remedies are deemed exhausted as to

all incidents of discrimination that are like or reasonably related to the allegations of the

administrative charge.’” Id. (quoting Alhalabi, 300 S.W.3d at 525). “‘Further, the scope of the

civil suit may be as broad as the scope of the administrative investigation which could reasonably

be expected to grow out of the charge of discrimination.’” Id. (quoting Alhalabi, 300 S.W.3d at

525). “A claim is like or reasonably related to the . . . charge [of discrimination] . . . if there is a

factual relationship between them.” Id. at 875 (internal quotation marks omitted).

 Liberally interpreting Williams’s administrative complaint, as the Missouri Supreme Court

requires us to do in Hill v. Ford Motor Co., 277 S.W.3d 659, 670 (Mo. banc 2009), both the

language of the 2015 Charge and particularly the last sentence of the 2015 Charge, as well as “the

scope of the administrative investigation which could reasonably be expected to grow out of the

charge of discrimination[,] would include an investigation” of specific instances of the City

retaliating against Williams as described in Instruction No. 12 and creating a hostile work

environment as described in Instruction No. 16. See Alhalabi, 300 S.W.3d at 526.

 Accordingly, for the numerous reasons identified above, the trial court did not abuse its

discretion in denying the City’s motion for new trial.

 27
 Points II and IV are denied.

 Point III

 In the City’s third point, it asserts that Instruction No. 12 contained disjunctive alternatives

that were not pleaded in Williams’s Petition for Damages. The City contends that Williams’s

failure to plead ultimate facts as to two disjunctive alternatives “prejudiced the City’s defense of

this case at trial” in that it “was caught by surprise when Mr. Williams submitted claims to the jury

which were not supported by pleaded facts” and “resulted in the jury being allowed to find in

Mr. Williams’ favor as to retaliation when all alternatives were not properly pleaded.” In the City’s

fifth point, it asserts that Instruction No. 16 contained a disjunctive alternative for which Williams

stipulated he did not have a right to sue.

 Analysis

 “‘A party cannot complain of error in the instruction of an opposing party which is common

to instructions of both parties.’” Travelers Com. Cas. Co. v. Vac-It-All Servs., Inc., 451 S.W.3d

301, 307 (Mo. App. E.D. 2014) (quoting Layton v. Pendleton, 864 S.W.2d 937, 941 (Mo. App.

W.D. 1993)). The two disjunctive alternatives in Paragraph Second of Instruction No. 12

challenged by the City were that the City either “[d]enied plaintiff promotions to the Electrical

Maintenance Supervisor positions that were awarded to James Crawford and/or Cornell Ragland,

or . . . [a]ccused plaintiff of sleeping on the job[.]” The City offered the identical language in its

proposed Instruction No. H, that the City either: “[d]enied plaintiff promotions to the electrical

Maintenance Supervisor positions that were awarded to James Crawford and/or Cornell Ragland,

or . . . [a]ccused plaintiff of sleeping on the job at East Bottoms[.]” L.F. Doc. 150, at 8. Thus, by

the City using the exact same language in the verdict director it proffered on Williams’s claim for

retaliation, the City waived any objection to Paragraph Second of Williams’s verdict director.

 28
Travelers Com. Cas. Co., 451 S.W.3d at 307 (citing Layton, 864 S.W.2d at 941; Gurley v.

Montgomery First Nat’l Bank, N.A., 160 S.W.3d 863, 872 n.4 (Mo. App. S.D. 2005); In re Care

& Treatment of Coffman, 92 S.W.3d 245, 251 (Mo. App. E.D. 2002); Tri-State Motor Transit Co.

v. Navajo Freight Lines, Inc., 528 S.W.2d 475, 487 (Mo. App. 1975)).

 Even if this claim of error was not waived, we find it is meritless. Section 509.050.1(1)

and Rule 55.05 provide that a pleading that sets forth a claim for relief shall contain “[a] short and

plain statement of the facts showing that the pleader is entitled to relief.” The facts that must be

pleaded must be ultimate facts, not necessarily evidentiary facts. McConnell v. W. Bend Mut. Ins.

Co., 606 S.W.3d 181, 190 (Mo. App. W.D. 2020). “‘[U]ltimate facts are those the jury must find

to return a verdict for the plaintiff.’” Id. (quoting R.M.A. by Appleberry v. Blue Springs R-IV Sch.

Dist., 568 S.W.3d 420, 425 (Mo. banc 2019)). See Scheibel v. Hillis, 531 S.W.2d 285, 290 (Mo.

banc 1976) (“A pleader is required to state only the ultimate facts[,] and it is not necessary to plead

the facts or circumstances by which the ultimate facts will be established.”).

 One reliable source for determining what the ultimate facts are is the Missouri Approved

Instruction (MAI) verdict director for the cause of action. R.M.A., 568 S.W.3d at 425-26. The

verdict director for an MHRA claim is MAI 38.01(A), which requires proof as follows:

 38.01(A) [2018 Revision] Verdict Directing–Missouri Human Rights Act—
 Employment Discrimination
 (for actions accruing before August 28, 2017)

 Your verdict must be for plaintiff if you believe:

 First, defendant (here insert the alleged discriminatory act, such as “failed to
 hire,” “discharged” or other act within the scope of § 213.055, RSMo) plaintiff,
 and

 Second, (here insert one or more of the protected classifications supported by
 the evidence such as race, color, religion, national origin, sex, ancestry, age or
 disability) was a contributing factor in such (here, repeat alleged discriminatory
 act, such as “failure to hire,” “discharge,” etc.), and

 29
 Third, as a direct result of such conduct, plaintiff sustained damage.

(Footnotes omitted). Comparing MAI 38.01(A) with Williams’s Petition, it is clear that he

sufficiently pleaded ultimate facts. First, Williams alleged that during his employment, the City

retaliated against him for complaining about harassment and/or discrimination, specifically for

complaining that Caucasian employees were allowed to take the Industrial Motor Control Training

Course while he and other African-American employees were not. Second, Williams alleged that

his complaints to the City about discrimination were protected activities under the MHRA, and

that his complaints of harassment and/or discrimination contributed to at least sixteen adverse

actions, which he identified, that the City took against him. Third, Williams alleged that as a direct

and proximate result of the City’s retaliatory conduct, which rendered his working conditions so

intolerable that he was forced to quit his job with the City, he sustained damage.

 The City refers us to no authority to support its argument that Williams’s Petition was

required to contain every specific fact submitted to the jury. “[A] petition merely commences a

case.” Tate v. Dierks, 608 S.W.3d 799, 804 (Mo. App. W.D. 2020). As to the denial-of-promotion

disjunctive, Williams alleged in his petition that the City had retaliated against him by denying

him promotions:

 c. passing over Plaintiff for promotion because of his race;
 d. giving less qualified Caucasian employees promotions, including but not limited
 to Michael Klinder, Steve Berry, and Fred Reiss;
 e. passing over or denying Plaintiff training opportunities;
 f. passing over or denying Plaintiff and/or other African American employees
 training opportunities which would have qualified Plaintiff and/or other African
 American employees for promotions;
 g. discontinuing training programs which blocked Plaintiff and/or other African
 American employees from completing future training and qualifying for
 promotions[.]

 30
L.F. Doc. 2, at 5-6. Additionally, at the City’s deposition of Williams on July 9, 2019, Williams

testified that James Crawford was a white employee who was promoted after he had taken the

industrial motor training control course that Williams and other African-American employees were

denied. L.F. Doc. 168, at 8-19. Further, in the City’s opening statement, the City’s attorney

discussed Mr. Crawford’s promotion to electrical supervisor, and Mr. Ragland’s promotion to

maintenance electrician supervisor. Trial Tr. vol. 1, 69, 71. As to the sleeping-on-the-job

disjunctive, although the Petition does not make that allegation, Williams testified in his July 2019

deposition that he was accused of sleeping on the job. L.F. Doc. 168, at 5. Further, in the City’s

opening statement, the City’s attorney told the jury, “You are going to hear about supervisors who

have caught employees sleeping in trucks and what—when they should have been working.” Trial

Tr. vol. 1, 72. “[T]he varied discovery tools available to counsel in the discovery toolbox are

designed to illuminate the salient facts associated with a case. A party’s understanding of the facts,

and of relevant witnesses and exhibits, will develop and mature as investigation and discovery

occur following the petition’s filing.” Tate, 608 S.W.3d at 804.

 The trial court did not abuse its discretion in denying the City’s Motion for New Trial. The

City has not shown that Instruction No. 12 misdirected, misled, or confused the jury where the

City’s own proffered instruction contained disjunctive alternatives that were identical to those

contained in the verdict director offered by the City and were either pleaded in Williams’s Petition

for Damages or developed in discovery. Furthermore, the City has failed to show how it was

prejudiced.

 Point III is denied.

 31
 Point V

 In the City’s fifth and sixth points, it asserts that the trial court erred in denying its Motion

for New Trial because Instruction No. 16 misdirected, misled, or confused the jury in that the

instruction contained a disjunctive alternative (relating to “the megger incident”) for which the

City argues Williams did not have a right to sue.

 Analysis

 “‘A party cannot complain of error in the instruction of an opposing party which is common

to instructions of both parties.’” Travelers Com. Cas. Co., 451 S.W.3d at 307 (quoting Layton,

864 S.W.2d at 941). The City argues that Instruction No. 16 was improper because it allowed the

jury to consider the disjunctive alternative of the City “[s]ubjecting plaintiff to unfair discipline

when he was attempting to fix the megger in 2013.” However, the City offered the identical

language in its proposed Instruction No. M: that the City subjected Williams to unwelcome

harassment by “[s]ubjecting plaintiff to unfair discipline when he was attempting to fix the megger

in 2013.” L.F. Doc. 150, at 14. Thus, by the City using the exact same language in the verdict

director it submitted on Williams’s claim for hostile work environment, the City waived any

objection to the second paragraph of Williams’s verdict director. Travelers Com. Cas. Co., 451

S.W.3d at 307.

 Furthermore, the trial court expressly determined that the “megger incident” was part of a

“continuing violation” theory.9 The City does not challenge the trial court’s finding of a continuing

 9
 Section 213.075.1 requires any person claiming to be aggrieved by an unlawful discriminatory practice to
file a written verified complaint with the Commission within 180 days of the alleged act of discrimination. “However,
the timely filing requirement is subject to the principles of waiver, estoppel, and equitable tolling, including the
‘continuing violation’ theory exception.” Tisch, 368 S.W.3d at 252. “Under the ‘continuing violation’ theory, a
plaintiff may pursue a claim for an event that occurred prior to the 180-day statute of limitations for filing a claim of
discrimination with the MCHR if the plaintiff can demonstrate that the event is part of an ongoing practice or pattern
of discrimination by the employer.” Id. (internal quotation marks omitted). Continuing violations “consist of
‘repeated conduct’ extending over a period of time.” Id. at 254 (quoting Nat’l R.R. Passenger Corp. v. Morgan, 536

 32
violation; therefore, that issue is abandoned on appeal. “[A] question not presented in an

appellant’s brief will be considered abandoned on appeal and no longer an issue in the case.”

Blackman v. Div. of Emp’t Sec., 602 S.W.3d 824, 826 (Mo. App. W.D. 2020); see also

Rule 84.13(a) (“[A]llegations of error not briefed or not properly briefed shall not be considered

in any civil appeal.”). Therefore, the City’s claims of instructional error relating to the “megger

incident” is without merit.

 Points V and VI are denied.

 Point VII

 In the City’s seventh point on appeal, it asserts that the trial court erred in admitting

evidence. Specifically, the City contends that the trial court erred when it allowed Leroy Jones to

testify because his testimony unduly prejudiced the City in that Mr. Jones’s involvement in the

trial was not disclosed by Williams’s counsel.

 Standard of Review

 The trial court’s admission or exclusion of evidence is reviewed under a deferential

standard. Ostermeier v. Prime Props. Invs. Inc., 589 S.W.3d 1, 10 (Mo. App. W.D. 2019). “On

appellate review, the issue is not whether the evidence was admissible or should have been

excluded, it is whether the trial court abused its discretion in admitting or excluding the evidence.”

Id. “‘A circuit court has broad discretion in determining the admission of evidence[.]’” Id.

(quoting Lewellen v. Franklin, 441 S.W.3d 136, 149 (Mo. banc 2014)). A trial court abuses its

discretion only when its ruling is “clearly against the logic of the circumstances and is so arbitrary

and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.” Id.

(internal quotation marks omitted). “If reasonable persons may differ as to the propriety of an

U.S. 101, 115 (2002)). “One example is a hostile work environment claim[,]” which involves repeated conduct,
“where liability is based on the ‘cumulative effects of individual acts.’” Id. (quoting Morgan, 536 U.S. at 115).

 33
action taken by the trial court, then there was no abuse of discretion.” Id. (internal quotation marks

omitted). “Even if we find an abuse of discretion, we will reverse only if the prejudice resulting

from the improper admission of evidence is outcome-determinative.” Id. (internal quotation marks

omitted).

 Analysis

 Interrogatory No. 24 in the City’s second set of interrogatories to Williams asked him to

“identify the witnesses whom you may call at trial to provide ‘me too’ witness testimony on your

behalf.” Williams served his interrogatory answers on November 25, 2019, two months before

trial commenced on January 27, 2020, responding to Interrogatory No. 24 that Williams “may call

any of the following people as ‘me too’ witnesses—Leroy Jones [address].” L.F. Doc. 136, at 4.

The City admits that “Mr. Williams disclosed Leroy Jones as a potential witness who would testify

at trial” prior to the close of discovery. Appellant’s Br. 52. The trial court entered two scheduling

orders in December 2019. L.F. Docs. 11, 12. Although neither order required the parties to file

witness lists, on January 22, 2020, Williams filed a witness list, which identified Mr. Jones as one

of the potential witnesses Williams might call to testify at trial. L.F. Doc. 132, at 1. Mr. Jones

testified on January 31, 2020. Trial Tr. vol. 1, 733.

 The City was notified before the close of discovery and two months before trial that

Mr. Jones might be called as a “me too” witness. The City had ample time to interview or depose

Mr. Jones prior to trial, but chose not to do so.

 The City asserts that “the prejudice of Mr. Jones’ testimony is apparent from the record.”

Appellant’s Br. 53. The City contends that because Mr. Jones did not work at the same location

as Williams, did not have the same job classification, did not have the same supervisors, and did

not seek to attend the same training, his testimony expanded the scope of the case and permitted

 34
Williams to argue that the alleged discrimination was widespread throughout the City’s workforce.

Appellant’s Br. 53-54. We disagree.

 This Court has held that a trial court acts within its discretion in allowing “me-too” witness

testimony by other public employees in a public employee’s hostile work environment action,

despite the fact that the other employees worked in different departments and under different

supervisory personnel than the plaintiff, noting that both the “me-too” witnesses and the plaintiff

were city employees, had alleged discriminatory treatment in the workplace, and had attempted to

seek redress through the City’s Equal Employment Opportunity office. McKinney v. City of

Kansas City, 576 S.W.3d 194, 204 (Mo. App. W.D. 2019). Accordingly, the trial court did not err

in allowing Mr. Jones’s testimony.10

 Point VII is denied.

 Point VIII

 In the City’s eighth point, it asserts that the trial court erred in denying the City’s post-trial

motion to merge the compensatory damage verdicts for retaliation and hostile work environment.

The City contends that the alleged discriminatory conduct in the verdict director for the retaliation

claim, Instruction No. 12, and the verdict director for the hostile work environment claim,

Instruction No. 16, substantially overlapped and that allowing both verdicts to stand would award

Williams more than one recovery for the same injury.

 The City, however, did not object at the instruction conference to the verdict-directing

instructions on those grounds.

 10
 Mr. Jones testified that he was a maintenance supervisor in the City’s waste water treatment division;
experienced retaliatory actions by the water department in that he received unfair discipline after testifying on behalf
of an employee who brought a discrimination lawsuit against the City; he applied for five or six promotions for which
he was the most qualified candidate, as he was competing against candidates that had less seniority and less education,
but he did not receive any of those promotions; he had been denied working out of class, even though he was qualified
to work out of class; he had been harassed by his immediate supervisors; he had made a complaint to the City’s Equal
Employment Opportunity office but none of his complaints had been addressed. Trial Tr. vol. 1, 733-39.

 35
 Rule 70.03 provides: “No party may assign as error the giving or failure to give instructions

unless that party objects thereto on the record during the instructions conference, stating distinctly

the matter objected to and the grounds of the objection.” The City objected to Instruction No. 12

on the grounds of “lacking a right to sue, unexhausted, unpleaded, and to the extent it involves the

complaint of—about the motor control course lacking a causal relationship with any adverse

employment action.” Trial Tr. vol. 2, 1057. The City also objected to the first paragraph of

Instruction No. 12 on the grounds that:

 it invites a roving commission as to the complaint of discrimination. Specifically
 the second half of it. And/or verbally complained of race discrimination to Steve
 Barry. And/or filed charges of discrimination during his employment. Those
 actually last two clauses do not define a time period or any other facts that would
 help orient the jury to what complaints are actionable and the jury could then rove
 to unactionable complaints that are not exhausted, pleaded, all the above.

Trial Tr. vol. 2, 1057-58. The City also objected to Instruction No. 12 because “among the

disjunctive acts [in] the second paragraph, only the pilot electrical training class was a pleaded,

exhausted adverse employment action in this case.” Trial Tr. vol. 2, 1058-59. The City objected

to Instruction No. 16, the verdict director on racially hostile work environment, on the grounds of

“lack of right to sue, exhaustion, failure to plead in the petition, and time barred, under the two-year

statute of limitations.” Trial Tr. vol. 2, 1062. Accordingly, because the City failed to make the

specific objection to the instructions it is now claiming to be error, the issue is not preserved for

appellate review. City of Harrisonville v. McCall Serv. Stations, 495 S.W.3d 738, 747 (Mo. banc

2016) (citing Howard v. City of Kansas City, 332 S.W.3d 772, 790 (Mo. banc 2011)).

 Even if the issue had been preserved, it is meritless. The City requested that the trial court

amend the judgment to merge the damages. In reviewing the trial court’s denial of a motion to

amend the judgment:

 36
 we will not reverse the trial court unless it abused its discretion. A [trial] court
 abuses its discretion when its ruling shocks the sense of justice, shows a lack of
 consideration, and is obviously against the logic of the circumstances. If reasonable
 persons can differ as to the propriety of the trial court’s action, then it cannot be
 said that the trial court abused its discretion.

 The doctrine of merger prevent[s] a party from being compensated twice
 for the same injury. Although a single transaction may invade more than one
 right[,] and a plaintiff is entitled to proceed on numerous theories of recovery, he
 is not allowed to be made more than whole or receive more than one full recovery
 for the same harm. [A] plaintiff must establish a separate injury on each theory
 presented at trial. Thus, [i]f the damages asserted in two causes of action are the
 same, the damage awards should be merged.

Heckadon v. CFS Enters., Inc., 400 S.W.3d 372, 380-81 (Mo. App. W.D. 2013) (citations omitted)

(internal quotation marks omitted). In Heckadon, the court found that the two plaintiffs submitted

the same benefit-of-the-bargain damage instruction with respect to each defendant, with each

instruction requesting the jury “to assess the damages flowing from the same injury.” Id. at 381.

The court reversed the judgment and remanded the case to the trial court to enter an amended

judgment merging the actual damage awards. Id.

 Here, Instruction No. 11 instructed the jury that Instructions 11 through 14 applied to the

retaliation claim and that Verdict B should be used to return the verdict on that claim. Instruction

No. 15 instructed the jury that Instructions 15 through 18 applied to the hostile work environment

claim and that Verdict C should be used to return the verdict on that claim. The jury awarded

Williams $160,000 in actual damages on his retaliation claim (Verdict B) and $126,000 in actual

damages on the hostile work environment claim (Verdict C). Unlike Heckadon, the verdict

director for the retaliation claim, Instruction No. 12, and the verdict director for the hostile work

environment claim, Instruction No. 16, contain different elements and require the jury to find

different injuries. Furthermore, separate damage instructions directed the jury to award damages

 37
for different claims and different injuries.11 In addition, the jury awarded different amounts for

each claim. The trial court’s decision not to merge the damages does not shock our sense of justice,

show a lack of consideration, and is not obviously against the logic of the circumstances.

 Point VIII is denied.

 Point IX

 In the City’s ninth and final point, it asserts that the trial court erred in awarding Williams

attorney fees with a 1.5 multiplier. The City does not challenge the lodestar awarded to Williams’s

counsel, and acknowledges that a multiplier of an attorney fee award may be applied. The City

only argues that the 1.5 multiplier was improper because the trial court did not specify any factors

that justified such an award.

 Standard of Review

 We review a trial court’s award of attorney fees for an abuse of discretion. Berry v.

Volkswagen Grp. of Am., Inc., 397 S.W.3d 425, 430 (Mo. banc 2013). “The trial court is deemed

an expert at fashioning an award of attorneys’ fees and may do so at its discretion.” Id. “To

demonstrate an abuse of discretion, the complaining party must show the trial court’s decision was

against the logic of the circumstances and so arbitrary and unreasonable as to shock one’s sense of

justice.” Id. at 431 (internal quotation marks omitted).

 11
 Instruction No. 13 provided:

 If you find in favor of plaintiff on plaintiff’s claim for retaliation then you must award plaintiff such
 sum as you believe will fairly and justly compensate plaintiff for any damages you believe plaintiff
 sustained and is reasonably certain to sustain in the future as a direct result of the occurrence
 mentioned in the evidence.

 Instruction No. 17 provided:

 If you find in favor of plaintiff on plaintiff’s claim for hostile work environment, then you must
 award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any damages
 you believe plaintiff sustained and is reasonably certain to sustain in the future that the hostile work
 environment directly caused or directly contributed to cause.

 38
 Analysis

 Because a jury found in favor of Williams on his retaliation and hostile work environment

claims, Williams filed an after-trial motion for attorney fees, costs, and expenses, requesting that

the trial court amend the judgment to award him his reasonable attorney fees, applying a 1.5

multiplier to the lodestar amount. In the trial court’s Final Judgment and Order, it stated that it

“fully considered plaintiff’s motion [for attorneys’ fees, costs, expenses and post-judgment

interest], suggestions, attached affidavits and exhibits in support of plaintiff’s motion, and

Defendant’s suggestions and exhibits in opposition to plaintiff’s motion. Having fully considered

same[,] the court awards fees, expenses, and costs as provided herein.”

 Section 213.111.2 of the MHRA provides that the trial court “may award to the plaintiff

actual and punitive damages, and may award court costs and reasonable attorney fees to the

prevailing party . . . .” The City does not argue that the trial court abused its discretion in its award

of attorney fees; rather, it complains that the trial court did not provide an explanation of its award

of a multiplier. The Missouri Supreme Court advises that “when a trial court must determine

whether to apply a multiplier, it should avoid awarding a multiplier based upon facts that it

considered in its initial determination of the lodestar amount.” Berry, 397 S.W.3d at 432. In Berry,

the Court approved the trial court premising its use of a multiplier on the following factors that

were not duplicative of the factors utilized in its calculation of the lodestar amount: (1) plaintiff’s

counsel’s fee was always contingent, unlike the fees received by counsel for defendant; (2) taking

plaintiff’s case precluded counsel from accepting other employment that would have been less

risky; and (3) the time required by the demands of preparing this cause for trial delayed work on

plaintiff’s counsel’s other work. Id. at 432-33. According to the Court, “[t]hese findings support

 39
a finding that a multiplier was necessary to ensure a market fee that compensated . . . counsel for

taking this case in lieu of working less risky cases on an hourly basis.” Id. at 433.

 Here, the trial court had evidence before it that allowed it to assess whether a multiplier to

the lodestar amount was appropriate in this case. The trial court had before it evidence that:

(1) Williams’s attorneys accepted this case on a contingency basis, see L.F. Doc. 157, ¶¶ 13, 22;

L.F. Doc. 159, ¶ 15; L.F. Doc. 162, ¶ 23; and (2) taking the case precluded Williams’s attorneys

from accepting other employment that would have been less risky or for which they would have

been compensated on an hourly basis, see L.F. Doc. 157, ¶ 15; L.F. Doc. 159, ¶¶ 15, 16; L.F. Doc.

162, ¶ 24. As to factor (3), the City conceded that the time required by the demands of preparing

for trial delayed work on Williams’s attorneys’ other work: “Plaintiff states a multiplier should be

awarded because the trial in this case delayed Plaintiff’s attorneys’ work on other cases. Of course

that is true.” L.F. Doc. 171, at 9. The City has not refuted the evidence presented by Williams’s

attorneys to justify the requested lodestar multiplier of 1.5.

 We find that the trial court’s decision as to the amount of attorney fees, which included a

1.5 multiplier, was not arbitrary nor was the award so unreasonable that it indicates indifference

and lack of proper judicial consideration.

 Point IX is denied.

 40
 Conclusion

 The trial court’s judgment is affirmed.12

 /s/ Mark D. Pfeiffer
 Mark D. Pfeiffer, Judge

Gary D. Witt, Anthony Rex Gabbert, Edward R. Ardini, Jr., and W. Douglas Thomson, Judges,
and Joseph M. Ellis and Thomas H. Newton, Senior Judges, concur.

Alok Ahuja, Judge, dissents in separate opinion in which Cynthia L. Martin, Chief Judge, and
Karen King Mitchell and Thomas N. Chapman, Judges, concur.

 12
 Under this Court’s Special Rule 29, a party may file a motion for attorney’s fees on appeal “pursuant to
contract, statute or otherwise.” Mr. Williams filed a motion for attorney’s fees on appeal, which we took with the
case. Mr. Williams brought the underlying cause of action pursuant to the Missouri Human Rights Act (“MHRA”).
The MHRA authorizes the court to “award court costs and reasonable attorney fees to the prevailing party . . . .”
§ 213.111.2. “This includes fees incurred on appeal from the trial court’s judgment.” Soto v. Costco Wholesale Corp.,
502 S.W.3d 38, 58 (Mo. App. W.D. 2016). Here, because we are affirming the judgment in favor of Mr. Williams,
Mr. Williams is the prevailing party. Therefore, his motion for costs and attorney’s fees on appeal is granted.
“Although appellate courts have authority to allow and fix the amount of attorney’s fees on appeal, we exercise this
power with caution, believing in most cases that the trial court is better equipped to hear evidence and argument on
this issue and determine the reasonableness of the fee requested.” Id. (internal quotation marks omitted). Accordingly,
we remand the cause to the trial court for the purpose of conducting a hearing to determine the reasonableness of the
costs and fees requested and to enter an appropriate award.

 41
 IN THE MISSOURI COURT OF APPEALS
 WESTERN DISTRICT
RONALD WILLIAMS, )
 )
 Respondent, )
v. ) WD83835
 ) (consolidated with WD83938)
CITY OF KANSAS CITY, )
MISSOURI, ) FILED: December 21, 2021
 )
 Appellant. )

 DISSENTING OPINION
 I respectfully dissent.

 The circuit court allowed plaintiff Ronald Williams to submit claims to the

jury which he had not properly exhausted in the administrative complaint he filed

with the Missouri Commission on Human Rights. Williams’ administrative

complaint challenged a specific practice: the City’s failure to permit him, and other

African-American electricians in the Water Services Department, to take an

Industrial Motor Control training course. Williams’ administrative complaint did

not allege: that he had ever been disciplined in his employment; that he had ever

been denied a promotion or additional compensation; that he had ever been given

unfavorable work assignments; that he had ever been harassed, demeaned, or

intimidated on the job; or that any prior complaints of discrimination had not been

seriously investigated. Williams’ administrative complaint was clear and explicit.

It alleged that he and other African-Americans had been wrongfully denied access
to a specific training course – nothing more. Williams’ counsel conceded as much at

oral argument.

 Yet despite the admittedly limited nature of Williams’ administrative

complaint, the circuit court permitted him to submit to the jury a hostile work

environment claim, and a retaliation claim, which alleged that he had been

subjected to unjustified discipline, and harassed and mistreated in a variety of

ways. Even under the most wildly expansive reading of Williams’ administrative

complaint, it alleged none of these matters.

 The Missouri Human Rights Act and a controlling Missouri Supreme Court

decision hold that an employee cannot litigate claims in court which the employee

has not first raised in a timely charge of discrimination with the Commission. The

circuit court failed to enforce this well-established exhaustion requirement, which

the City repeatedly invoked. I would reverse the circuit court’s judgment in

Williams’ favor on his hostile work environment and retaliation claims, and remand

the retaliation claim for retrial on the single allegedly retaliatory act which

Williams actually challenged before the Commission.

 I.
 A simple comparison of the charge of discrimination which Williams filed

with the Commission, and the hostile work environment and retaliation claims

which were submitted to the jury, demonstrates that Williams was allowed to

litigate claims going well beyond the scope of his administrative complaint.

 Williams filed a Charge of Discrimination with the Commission on October 2,

2015, alleging that the City had racially discriminated and retaliated against him.

Williams described the challenged actions as follows:

 I. I was hired by [the City] on or about 6/20/11 and I am currently
 employed as a Maintenance Electrician.
 II. On or about 11/14, Maintenance Electricians, white, were selected
 for and thereafter completed an industrial motor control training

 2
 course. I had more seniority than two of the Maintenance Electricians,
 as did another black Maintenance Electrician.

 III. I believe this is discrimination against me because of my race, black, in
 violation of Title VII of the Civil Rights Act of 1964, as amended, and retaliation
 against me for opposing acts made unlawful under Title VII of the Civil Rights Act
 of 1964, as amended.
Williams checked the box on the complaint form marked “Continuing Action,” and

identified the “Date(s) Discrimination Took Place” as November 7, 2014, through

April 15, 2015.

 On October 7, 2016, Williams filed an Amended Charge of Discrimination

with the Commission. The Amended Charge once again claimed that Williams had

been subjected to racial discrimination and retaliation by the City. The Amended

Charge stated:

 I have worked for the City of Kansas City, Missouri, for approximately
 seventeen years and have been in the Water Services Department for
 the last five years. Since November, 2014, when less-senior white
 employees were permitted to take an Industrial Motor Control
 Training Course, management has been offering to allow myself and
 other African-Americans the opportunity to take such a class. The
 White employees were paid while taking this class. Initially, we were
 told that there would be two groups taking the class. The White
 employees were permitted to take the class first. Neither myself nor
 any other African-Americans have been offered the same course. I
 believe that the City intended to use this class as a basis for
 reclassifying employees, as mention of a new job position of Utility
 Electrician was made and I believe this course would have been used
 as a qualification for that position. I complained to the
 Superintendent, Steve Berry, about the White employees getting to
 take the class and none of the African-American employees getting to
 and about wanting to talk to Human Resources about the new job
 position. After that, there has not been any more mention of the
 Utility Electrician position. Management continued to tell us that
 there would be a second class after the first group had finish[ed], it
 was even mentioned after I initially filed my charge. To this date, no
 second class has ever been offered.

 I believe that the City and the management at the Water Plant singled
 out the African-Americans and selected the White employees to take
 the class and that our race played a role in the decision; we had been

 3
 asking to take the course for years prior to it being offered to the White
 employees. I believe this is a clear pattern and practice by the City of
 permitting White employees to receive better training than African-
 Americans, that would put the White employees in a better position for
 promotion.
Williams’ Amended Charge again checked the “Continuing Action” box on the

charge form; it listed April 16, 2015, as the “Date Discrimination took Place.”

 Under the Commission’s regulations, “[t]he original complaint and all

amendments shall be treated together as a single complaint.” 8 CSR 60-2.025(5).

Accordingly, I refer to Williams’ original and amended complaints collectively as his

administrative “charge” or “complaint,” unless the context requires a distinction

between the two documents.

 I have read Williams’ administrative complaint over and over again since this

case was first submitted to a division of this Court several months ago. Williams’

administrative complaint is well-written, clear, and detailed. Yet despite my

repeated review, I can only see one employment practice which Williams challenged:

the City’s ongoing and repeated denial of training opportunities to Williams and to

other African-American electricians in the Water Services Department. I see no

reference in Williams’ charge, even under the broadest and most generous reading,

to unfair discipline, denial of promotions, unfavorable work assignments,

harassment, or perfunctory investigation of discrimination complaints. The

majority’s assertion that Williams’ charges “collectively describe a hostile,

intimidating, retaliatory and offensive work environment” (Maj. Op. at 2) is

unfounded.

 Notably, during oral argument Williams’ counsel admitted that Williams’

administrative complaint did not contain any allegation that he had ever been

disciplined in his employment; she conceded that “all that’s contained in the charge”

is a challenge to the denial of training opportunities. Oral Arg. Recording 33:15-
34:10.

 4
 Despite the limited nature of Williams’ administrative complaint, the circuit

court permitted him – over the City’s objections – to submit retaliation and hostile

work environment claims which relied on employment actions beyond the City’s

denial of access to the Industrial Motor Control training course. Thus, the verdict

director for Williams’ retaliation claim (Instruction #12) hypothesized that the City

had retaliated against him in one or more of the following respects:

 Treat[ing] Plaintiff as if he were incompetent, or
 Accus[ing] Plaintiff of not completing or performing work in an
 unsatisfactory manner, or
 Den[ying] plaintiff promotions to the Electrical Maintenance
 Supervisor positions that were awarded to James Crawford and/or
 Cornell Ragland, or
 Den[ying] plaintiff the opportunity to attend the 2014-2015 pilot
 electrical training class, or
 Accus[ing] plaintiff of sleeping on the job.
 The verdict director for Williams’ hostile work environment claim

(Instruction #16) went even further. It asked the jury to find that the City had

“[c]reated an intimidating, hostile, or offensive work environment,” or had taken

actions which “[h]ad the purpose or effect of unreasonably interfering with

plaintiff’s work performance,” by “subjecting plaintiff to unwelcome harassment in

any of the following respects:”

 Subjecting plaintiff to unfair discipline when he was attempting to fix
 the megger in 2013, or
 Denying plaintiff an impartial and fair investigation into his
 complaints of discrimination, or
 Accusing plaintiff of sleeping on the job, or
 Denying plaintiff the opportunity to attend the 2014-2015 pilot
 electrical training course, or
 Allowing plaintiff to be treated by his supervisors as if he were
 incompetent, or

 5
 Denying plaintiff promotions to the Maintenance Electrician
 Supervisor positions in 2015 where Cornell Ragland and/or James
 Crawford were promoted instead, or
 Giving plaintiff dangerous and/or undesirable work assignments in the
 lime vats and/or the secondary plant, or
 Confining plaintiff to the secondary plant with no mobility between the
 years 2013-2015, or
 Failing to provide plaintiff access to the parts and/or information
 plaintiff needed to perform his job duties.
 The allegedly discriminatory and retaliatory acts which Williams was

permitted to submit to the jury, as part of his hostile work environment and

retaliation claims, went light years beyond anything he had challenged in his

administrative complaint.

 The circuit court appears to have recognized, indirectly, that Williams’

administrative charge could not sustain the judgment. The circuit court could

justify denying the City’s post-judgment motion asserting a lack of exhaustion only

by claiming – inaccurately – that Williams’ “charges of discrimination alleged that

he was subjected to unfair discipline, was falsely accused of sleeping on the job, . . .

was given dangerous and undesirable work assignments, and was treated by his

supervisors as if he were ‘incompetent’ in the presence of other employees at staff

meetings.” Thus, the circuit court relied on a false characterization of Williams’
administrative charge to sustain the judgment. As I explain more fully below, the

judgment must be reversed under an accurate reading of Williams’ charge, and by

application of well-established law.

 II.
 I first address the City’s challenge to the submission of Williams’ hostile work

environment claim.

 A.
 At the time Williams filed his complaint, the MHRA provided:

 6
 Any person claiming to be aggrieved by an unlawful
 discriminatory practice may make, sign and file with the commission a
 verified complaint in writing, within one hundred eighty days of the
 alleged act of discrimination, which shall state the name and address
 of the person alleged to have committed the unlawful discriminatory
 practice and which shall set forth the particulars thereof and such
 other information as may be required by the commission.
§ 213.075.1.1

 The Missouri Supreme Court has explained that, “[i]n order to exhaust

administrative remedies under the MHRA, a claimant must give notice of all claims

of discrimination in the administrative complaint.” Farrow v. St. Francis Med. Ctr.,

407 S.W.3d 579, 594 (Mo. 2013) (citing Alhalabi v. Mo. Dep’t of Nat. Res., 300

S.W.3d 518, 525 (Mo. App. E.D. 2009)); accord Kerr v. Mo. Veterans Comm’n, 537

S.W.3d 865, 874 (Mo. App. W.D. 2017). An administrative complaint “give[s] the

agency the opportunity to determine the validity of the claim, to investigate, and to

determine if there is probable cause that discrimination has taken place.” Kerr, 537

S.W.3d at 874 (citation omitted). An administrative charge also “give[s] the charged

party notice of the claim,” and “narrow[s] the issues for prompt adjudication.” Id. at

875 (citation omitted).

 In Farrow, the Supreme Court emphasized that administrative complaints –

which are often filed by unrepresented laypeople – should be liberally construed:
 “[A]dministrative complaints are interpreted liberally in an effort to
 further the remedial purposes of legislation that prohibits unlawful

 1 The statutory citations in this opinion refer to the 2016 edition of the Revised
Statutes of Missouri. The General Assembly substantially amended the Missouri Human
Rights Act in 2017, with an effective date of August 28, 2017. See S.B. 43, 99th Gen.
Assembly, 1st Reg. Session (2017). Williams’ employment with the City terminated in
February 2017, and his substantive claims therefore accrued before the 2017 statutory
amendments became effective. In addition, he filed his original and amended
administrative complaints in 2015 and 2016, before the new statutory provisions took
effect. For these reasons, the pre-2017 version of the MHRA controls the present appeal.
See, e.g., Clark v. AT&T Mobility Servs., L.L.C., 623 S.W.3d 197, 203 (Mo. App. W.D. 2021);
State ex rel. D&D Distribs., LLC v. Mo. Comm’n on Human Rts., 579 S.W.3d 318, 324-25
(Mo. App. W.D. 2019); Dixson v. Mo. Dep’t of Corrs., 586 S.W.3d 816, 825-27 (Mo. App. W.D.
2019); Bram v. AT&T Mobility Servs., LLC, 564 S.W.3d 787, 795-96 (Mo. App. W.D. 2018).

 7
 employment practices.” “As a result, administrative remedies are
 deemed exhausted as to all incidents of discrimination that are likely
 or reasonably related to the allegations of the administrative charge.”
 “Further, the scope of the civil suit may be as broad as the scope of the
 administrative investigation which could reasonably be expected to
 grow out of the charge of discrimination.”
407 S.W.3d at 594 (quoting Alhalabi, 300 S.W.3d at 525).

 A “liberal construction” is not boundless, however. This is demonstrated by

Farrow itself. Farrow held that a charge which alleged that an employee had been

discharged for racially discriminatory reasons did not give notice of a separate claim

that the employer retaliated against the employee in its grievance procedure

following her termination.

 Farrow argues her claim of post-termination retaliation related
 to Hospital's internal grievance procedure is reasonably related to the
 allegations in the charge of discrimination she filed with the
 Commission, and an administrative investigation of post-termination
 retaliation reasonably could be expected to grow out of the allegations
 contained in her charge. This Court disagrees. A liberal reading of the
 charge of discrimination clearly indicated Farrow limited the scope of
 her claim to the events that occurred prior to her December 2008
 discharge. The charge of discrimination contains no allegations
 whatsoever that would put Hospital on notice that she intended to
 raise additional claims regarding retaliation for its treatment of her
 while she sought relief under Hospital's internal grievance procedure.
 The first time Hospital was apprised of this claim was in Farrow's first
 amended petition. Thus, the charge of discrimination was not likely or
 reasonably expected to lead to an investigation of adverse employment
 practices committed during Hospital's internal grievance procedure.
407 S.W.3d at 594. Although Farrow’s administrative complaint clearly challenged

her termination as racially discriminatory, the Supreme Court held that her charge

– even broadly construed – did not include a challenge to her employer’s

investigation of her termination.

 The Eastern District’s decision in Reed v. McDonald’s Corp., 363 S.W.3d 134

(Mo. App. E.D. 2012), similarly holds that a liberal reading of an administrative
complaint is limited to the circumstances described in the charge. In Reed, a

 8
restaurant employee (Reed) filed a charge of discrimination alleging that an

assistant manager (Emanuel) had sexually harassed and assaulted her. Reed

reported the incident to senior management, and Emanuel was terminated. Reed

later quit her job at the restaurant, “citing the sexual harassment by Emanuel and

the stress of everybody knowing the situation that occurred as being the reasons for

her departure.” Id. at 138. Reed’s administrative charge “did not mention any

circumstances regarding her employment . . . after she reported the incidents [of

harassment].” Id.

 In Reed, the employee alleged that she left her employment because of the

sexual harassment which was the subject of her administrative complaint. Despite

the fact that the employee’s resignation grew out of the underlying sexual

harassment, the Eastern District held that Reed had failed to exhaust her claim of

constructive discharge.

 Reed's charges filed with the MCHR did not even mention that she no
 longer worked for Franchisee. The charges failed to mention any facts
 or particulars relating to intolerable working conditions causing her to
 quit working for Franchisee. Instead, Reed's charges filed with the
 MCHR and the EEOC focused only on conduct by Emanuel. By
 focusing only on Emanuel's conduct towards Reed, the charges failed to
 give notice to Franchisee that Reed was asserting a claim of
 constructive discharge. Furthermore, it is not reasonable to expect an
 administrative investigation of a claim of constructive discharge when
 Reed's charges did not even state that Reed no longer worked for
 Franchisee nor any facts relating to intolerable working conditions.
 Accordingly, Reed failed to exhaust her administrative remedies when
 she failed to include any facts reasonably related to a claim of
 constructive discharge.
Id. at 144.

 Read liberally, Williams’ administrative charge described ongoing racial

discrimination and retaliation by the City in denying access to training

opportunities. Even affording Williams’ charge a liberal construction, however, it

 9
cannot fairly be read to encompass the hostile work environment claim ultimately

submitted to the jury: that he was “subjected . . . to unwelcome harassment” by

 − being subjected to “unfair discipline”;
 − being denied “an impartial and fair investigation into his complaints of
 discrimination”;
 − being accused of sleeping on the job;
 − being “treated by his supervisors as if he were incompetent”;
 − being given “dangerous and/or undesirable work assignments”;
 − being restricted to a particular work location “with no mobility”; and
 − being denied the parts and information he needed to properly perform
 his work.
Although the circuit court’s order denying the City’s JNOV motion claimed that

these other acts were included in Williams’ administrative charge, the court was

mistaken: none of these specific instances of alleged harassment or mistreatment is

mentioned in any way in Williams’ administrative charge; indeed, his

administrative complaint makes no reference to “unwelcome harassment” at all.

 Williams’ administrative charge cannot be expanded to include a hostile work

environment claim by claiming that the Commission’s investigation would somehow

have uncovered the allegedly hostile work environment. Farrow makes clear that

an administrative investigation cannot be expected to discover additional allegedly

discriminatory or retaliatory acts where “[t]he charge of discrimination contains no
allegations whatsoever” concerning the unstated claims. 407 S.W.3d at 594.

Similarly, Reed holds that the Commission’s investigation cannot be expected to

discover additional claims where the administrative charge “failed to mention any

facts or particulars relating to” those additional claims. 363 S.W.3d at 144.

Williams concedes that his administrative charge is limited to the City’s denial of

training opportunities, and “contains no allegations whatsoever” concerning the acts

allegedly constituting a hostile work environment. Williams’ concession concerning

the limited scope of his administrative complaint should end the matter. Under
Farrow, Williams cannot invoke the “likely scope of investigation” or “reasonably

 10
related” tests to establish exhaustion of a claim which is completely untethered

from the allegations of his complaint itself.

 Williams’ challenge of a specific employment practice (the denial of training

opportunities) does nothing to suggest that the environment or atmosphere in which

he worked was sufficiently hostile to be actionable. A hostile work environment

claim is fundamentally different from a claim that an employer has taken specific

adverse employment actions against a complaining employee. A hostile work

environment claim alleges that the employee has been subject to ongoing, repeated

harassment that poisons the workplace atmosphere.

 Racial discrimination creates a hostile work environment when
 discriminatory conduct either creates an intimidating, hostile, or
 offensive work environment or has the purpose or effect of
 unreasonably interfering with an individual’s work performance. In
 most claims of hostile work environment harassment, the
 discriminatory acts are not of a nature that can be identified
 individually as significant events; instead, the day-to-day harassment
 is primarily significant, both as a legal and as a practical matter, in its
 cumulative effect.
Alhalabi, 300 S.W.3d at 526 (citing Hill v. Ford Motor Co., 277 S.W.3d 659, 666 (Mo.

2009); and Pollock v. Wetterau Food Distrib. Grp., 11 S.W.3d 754, 763 (Mo. App.

E.D. 1999)).
 [A] hostile work environment claim . . . must be based on severe and
 pervasive discriminatory intimidation or insult. . . . A hostile work
 environment under Title VII must be based on . . . pervasive, insulting,
 discriminatory conduct that makes the plaintiff's day-to-day work
 environment severely abusive. Therefore, cobbling together a number
 of distinct, disparate acts will not create a hostile work environment.
 For example, if an employee is discriminatorily denied ten promotions
 over a period of time, that pattern of conduct may give rise to ten
 separate claims under Title VII, but it would not create a hostile work
 environment claim based on pervasive intimidation, insult and
 ridicule.
Rattigan v. Gonzales, 503 F. Supp.2d 56, 81–82 (D.D.C. 2007) (citations and
internal quotation marks omitted).

 11
 Because a hostile work environment claim involves the overall working

environment, rather than particular employment decisions, “[t]o be properly

exhausted, that claim must be separately raised in the administrative charge,

because it is not reasonably related to a claim of a discrete act of discrimination,

such as demotion.” Gipson v. KAS Snacktime Co., 83 F.3d 225, 229 (8th Cir. 1996)

(MHRA claim), overruled on other grounds by Nat’l R.R. Passenger Corp. v. Morgan,

536 U.S. 101 (2002); see also Tisch v. DST Sys., Inc., 368 S.W.3d 245, 253-54 (Mo.

App. W.D. 2012) (distinguishing a hostile work environment claim, which “by [its]

very nature . . . involves repeated conduct, where liability is based on the

cumulative effects of individual acts,” from claims related to discrete acts like

termination, failure to promote, denial of transfer, or refusal to hire (citations and

internal quotation marks omitted)).

 In two decisions involving MHRA claims, the United States Court of Appeals

for the Eighth Circuit has held that an employee had not adequately exhausted a

hostile work environment claim, where the employee’s administrative complaint

challenged only discrete employment actions. Thus, in Dorsey v. Pinnacle

Automation Co., 278 F.3d 830 (8th Cir. 2002), the administrative charges filed by

multiple plaintiffs alleged that they were being discriminated against based on
their age, because “younger (under 40) . . . employees that have considerably less

seniority are consistently receiving wage increases greater than” older workers.

Id. at 834. The Eighth Circuit held that this was insufficient to exhaust a hostile

work environment claim, either under the MHRA or under federal law.

 In this case, Appellants' claims for age discrimination based on
 the failure to promote presented in their charge of discrimination is not
 broad enough to encompass hostile work environment claims. Here,
 the decisions not to promote Appellants was a discrete event completed
 at the time of the promotions. On the other hand, “a claim of racial
 harassment in the workplace focuses on the pervasiveness of the
 racially discriminatory conduct and also the employer's possible
 knowledge of that conduct and failure to take remedial action.” The

 12
 promotions are not like or reasonably related to Appellants allegations
 of the harassment that occurred throughout their employment.
Id. at 838-39 (citations omitted). The Court reached the same result in Tart v. Hill

Behan Lumber Co., 31 F.3d 668 (8th Cir. 1994), holding that a hostile work

environment claim was not exhausted by an administrative complaint which

alleged only that the employee was terminated for racially discriminatory reasons.

Id. at 672-73.

 Caselaw applying federal civil rights statutes reaches the same result. “‘In

deciding a case under the MHRA, appellate courts are guided by both Missouri law

and federal employment discrimination caselaw that is consistent with Missouri

law.’” Lin v. Ellis, 594 S.W.3d 238, 242 (Mo. 2020) (quoting Daugherty v. City of

Maryland Hts., 231 S.W.3d 814, 818 (Mo. 2007)). Federal caselaw is particularly

relevant here, because the principle that administrative complaints are entitled to a

liberal construction originates in federal law. Farrow, 407 S.W.3d at 594, quotes

the rule of liberal construction stated in Alhalabi, 300 S.W.3d at 525, which in turn

relies on the Eighth Circuit’s decision in Tart, 31 F.3d at 671. Tart derives the

liberal construction rule from Cobb v. Stringer, 850 F.2d 356, 359 (8th Cir. 1988),

and other federal cases involving claims filed under Title VII of the federal Civil

Rights Act of 1964.

 Cases applying federal anti-discrimination statutes have repeatedly held that

an administrative charge that merely alleges specific, discrete acts of discrimination

does not encompass a claim of a hostile work environment. Because a hostile work

environment claim involves repeated acts of harassment which make a plaintiff’s

working conditions abusive or intolerable, these cases hold that “the inclusion in an

EEOC charge of a discrete act or acts, standing alone, is insufficient to establish a

hostile-work-environment claim for purposes of exhaustion.” Younis v. Pinnacle
Airlines, Inc., 610 F.3d 359, 362 (6th Cir. 2010). The federal courts have cautioned

 13
that, if a charge alleging discrete acts of discrimination were interpreted to include

a hostile work environment claim, then

 a hostile environment claim would lurk behind almost any EEOC
 charge of discrimination. While no magic words are required, some
 language suggesting continuing and abusive conduct is necessary.
Crawley v. State of Ohio, C-2-02-1069, 2006 WL 3231341, at *24 (S.D. Ohio Nov. 6,

2006) (citations omitted). Innumerable other federal cases reach the same result.2

 Under the Missouri and federal caselaw discussed above, Williams’ complaint

that he was unlawfully denied the opportunity to participate in training programs

does not exhaust a separate claim that he was subjected to a hostile work

environment. Williams’ administrative complaint made no reference to on-the-job

harassment, and made absolutely no reference to the numerous specific instances of

harassment (involving work assignments, discipline, disparaging treatment, and

denial of promotions or other benefits) which he now contends created the hostile

2 See, e.g., Green v. Postmaster Gen. of U.S., 437 Fed. Appx. 174, 178 (3d Cir. 2011)
(administrative complaint alleging failure-to-promote “does not encompass [plaintiff’s]
separate claim of hostile work environment”); Swinnie v. Geren, 379 Fed. Appx. 665, 667
(9th Cir. 2010) (complaint alleging discrete discriminatory acts “would not have put the
EEO investigator on notice of a pattern of conduct ‘sufficiently severe or pervasive’ so as to
create an ‘abusive work environment’”); Mathirampuzha v. Potter, 548 F.3d 70, 77 (2d Cir.
2008) (hostile work environment claim not exhausted where “[t]he plaintiff's administrative
complaint contains no reference to repeated conduct or the cumulative effect of individual
acts”); Gates v. Lyondell Petrochemical Co., 227 Fed. Appx. 409, 409 (5th Cir. 2007) (hostile
work environment claim not exhausted where plaintiff’s administrative charge challenged
“only her employer's discrete acts in terminating and failing to promote her”); Green v.
Elixir Indus., 152 Fed. Appx. 838, 840–41 (11th Cir. 2005) (“all of the factual allegations
contained in Green's EEOC charge relate to his termination,” and “[n]othing in Green's
EEOC charge related to incidents of harassment”); Park v. Howard Univ., 71 F.3d 904, 908
(D.C. Cir. 1995) (collecting cases; “The bald statement that ‘[i]t is my belief that I was
denied the opportunity for advancement in my career because of . . . my national origin’
cannot be read to encompass a hostile work environment claim.”); Rush v. McDonald’s
Corp., 966 F.2d 1104, 1111-12 (7th Cir. 1992) (administrative charge challenging plaintiff’s
termination as racially motivated did not exhaust a hostile work environment claim); Habib
v. Tote Services, C14-1685RSL, 2017 WL 108553, at *5 (W.D. Wash. Jan. 11, 2017), aff'd,
699 Fed. Appx. 759 (9th Cir. 2017) (administrative complaint alleging that plaintiff was
accused of misconduct, and then discharged, for discriminatory reasons did “not allege that
plaintiff was subject to harassment so pervasive that it created an abusive working
environment”).

 14
environment. Notably, at trial Williams himself acknowledged that his

administrative complaint said nothing about on-the-job harassment, or concerning a

hostile work environment.3

 Williams’ hostile work environment claim should not have been submitted to

the jury, and the judgment on that claim must be reversed.

 B.
 The majority, and Williams, make a series of responses to the City’s

exhaustion argument. None of those responsive arguments are persuasive.

 1.
 As an initial matter, the majority concludes that the City waived its

exhaustion arguments, because it failed to adequately plead lack of exhaustion as

an affirmative defense in its First Amended Answer.

 The City’s First Amended Answer set forth the full text of Williams’ original

and amended charges of discrimination. The City then alleged that Williams’

original and amended charges “only serve to exhaust claims that are related to the

City’s offering of the Industrial Motor Control Training Course,” and that “[a]ny of

the factual allegations in Plaintiff’s Petition which do not pertain to the particulars

included in his Charge of Discrimination and Amended Charge of Discrimination
have not been adequately exhausted.” The City renewed its exhaustion argument

in a motion seeking to limit the scope of discovery, in a motion for summary

judgment, in a motion in limine, in a motion for directed verdict, and in a motion for

judgment notwithstanding the verdict. During trial, the City renewed its motion in

3 It may be that, if Williams had adequately exhausted a hostile work environment
claim, evidence concerning events beyond the denial of training opportunities would have
been admissible as “background evidence” to support that claim. See McKinney v. City of
Kansas City, 576 S.W.3d 194, 199 (Mo. App. W.D. 2019); Tisch v. DST Sys., Inc., 368 S.W.3d
245, 254 (Mo. App. W.D. 2012). But the question in this case is not the scope of admissible
evidence to support a hostile work environment claim; the question presented here is
whether Williams may litigate a hostile work environment claim at all.

 15
limine before Williams’ testimony began, and was given a continuing objection by

the court. The City made similar objections with respect to the testimony of other

witnesses during Williams’ case in chief, and on multiple occasions the court stated

that the objections were continuing.

 At every conceivable opportunity, the City raised its claim that Williams had

failed to exhaust his hostile work environment claim, because that claim was not

included in the charge of discrimination he filed with the Missouri Commission on

Human Rights. In response to the City’s repeated exhaustion arguments, Williams

never suggested, prior to the jury’s verdict, that the manner in which the defense

was pleaded in the City’s First Amended Answer was somehow insufficient. By

“fail[ing] to file a motion for more definite statement” challenging the specificity of

the allegations in support of the exhaustion defense in the City’s First Amended

Answer, Williams “waived [his] right to complain of its definiteness.” State ex rel.

Harvey v. Wells, 955 S.W.2d 546, 547 (Mo. 1997).

 Even if Williams had preserved an objection to the adequacy of the factual

allegations in the City’s First Amended Answer, those allegations were sufficient in

any event. “While a party pleading an affirmative defense must allege ultimate

facts, the party does not need to allege evidentiary facts.” Mo. Landowners Alliance
v. Grain Belt Exp. Clean Line LLC, 561 S.W.3d 39, 45 (Mo. App. W.D. 2018)

(citation omitted). The only fact necessary to decide the City’s exhaustion defense

was the content of Williams’ administrative complaint, which was set out verbatim

in the City’s First Amended Answer. Besides setting forth the full text of Williams’

administrative complaint, the City also affirmatively alleged that Williams’

complaint “only serve[d] to exhaust claims that are related to the City’s offering of

the Industrial Motor Control Training Course” – the precise argument the City

continues to assert on appeal. The majority does not identify any additional facts

 16
which the City’s First Amended Answer omitted. The City was not required to

make a detailed legal argument concerning exhaustion in its answer.

 The majority suggests that the City was required to catalog every allegation

of Williams’ petition which was not “related to the City’s offering of the Industrial

Motor Control Training Course.” This elevates form over substance: by explicitly

alleging that “only” one identified claim had been properly exhausted, the City

necessarily alleged that all other claims were not. The preservation argument is

meritless.

 The majority opinion notes (at pages 9-10), that Williams moved to strike the

affirmative defenses asserted in the City’s original Answer – a motion which the

circuit court granted. Maj. Op. at 9-10. The majority suggests that this motion to

strike attacked the factual allegations supporting an exhaustion defense, and that

in granting the motion, the circuit court “stated that the City’s affirmative defense

of exhaustion of remedies, ‘fail[s] to fulfill the requirements of Mo. R. Civ. P. 55.08.’”

Maj. Op. at 10. What the majority fails to acknowledge, however, is that the City’s

original answer did not plead an exhaustion defense at all. Williams’ motion to

strike challenged the affirmative defenses alleged in paragraphs 76, 77, and 79 of

the City’s Answer. See LF 44. Those paragraphs alleged that Williams’ claims
failed because “[t]he alleged acts of discrimination about which Mr. Williams

complains occurred more than 180 days before Mr. Williams filed his Charge of

discrimination with the Missouri Commission on Human Rights”; that “[t]he alleged

acts of discrimination about which Mr. Williams complains occurred more than two

years prior to Mr. Williams’ filing of his Petition”; and that “Mr. Williams has failed

to mitigate his damages.” See LF 5, at 12. It is those allegations – of statute of

limitations and failure-to-mitigate defenses – which Williams attacked as

inadequate, and which the circuit court found to be deficient.

 17
 The majority does not explain what relevance it could conceivably have that

the circuit court found the City’s pleading of statute of limitations and failure-to-

mitigate defenses in its original Answer to be deficient. I perceive none. The City’s

original answer was superseded and abandoned when the circuit court gave the

City leave to file its First Amended Answer. Sherrer v. Boston Scientific Corp., 609

S.W.3d 697, 711 n.11 (Mo. 2020) (citing State ex rel. Crowden v. Dandurand, 970

S.W.2d 340, 342 (Mo. 1998)). And none of the parties raises a statute of limitations

or failure-to-mitigate issue on appeal. Whether or not the City’s other defenses

were adequately pleaded, in a superseded pleading, is beside the point.

 The majority also suggests that, after the City filed its First Amended

Answer (which first raised an exhaustion defense), Williams attacked the

sufficiency of the exhaustion defense pleaded by the City. Maj. Op. at 12. This

contention once again misreads the record. The majority cites to Williams’

suggestions in opposition to the City’s motion for summary judgment on the

exhaustion issue. But what Williams was challenging in his suggestions in

opposition was the adequacy of the factual allegations and legal argument in the

City’s motion for summary judgment, not the adequacy of the City’s pleading. Given

that the City was denied summary judgment, it is irrelevant whether the City
adequately argued exhaustion in its unsuccessful summary judgment motion.

Indeed, the City was not required to move for summary judgment at all in order to

preserve the exhaustion issue for appeal.

 If anything is significant about Williams’ suggestions in opposition to the

City’s motion for summary judgment, it is that Williams never argued that

summary judgment should be denied because the City was relying on an affirmative

defense which was not adequately pleaded. See, e.g., Morelock v. Intercontinental

Hotels Grp. Resources, LLC, No. SD37022, 2021 WL4145240, at *5 (Mo. App. S.D.
Sept. 13, 2021) (“A trial court errs as a matter of law when it grants summary

 18
judgment on the basis of an affirmative defense that was not properly pleaded.”

(citation omitted)). The fact that Williams never contended that the factual

allegations supporting the City’s exhaustion defense were inadequate – when the

City was seeking dispositive relief based on that defense – is a glaring omission.

 Despite the majority’s contrary claims, Williams never challenged in the

circuit court the allegations of the City’s First Amended Answer asserting the

affirmative defense of administrative exhaustion. By failing to challenge the City’s

First Amended Answer on this basis, Williams “waived [his] right to complain of its

definiteness.” State ex rel. Harvey v. Wells, 955 S.W.2d 546, 547 (Mo. 1997).

 The majority also claims, in a single sentence, that the City failed to preserve

its exhaustion argument because “its motion for directed verdict lacked specificity.”

Maj. Op. at 13. This contention is brand-new; Williams never made this argument,

either in the circuit court, or on appeal.

 I cannot understand what fault the majority finds in the City’s directed

verdict motions (either the motion it made at the close of Williams’ evidence, or the

one it made at the close of all of the evidence). Those motions were oral, but the

Missouri Supreme Court has only recently emphasized that, “[b]ecause the directed

verdict motion must be presented during trial, there is no requirement the directed
verdict motion must be written.” Rhoden v. Missouri Delta Med. Ctr., 621 S.W.3d

469, 476 (Mo. 2021) (citing Rule 55.26(a)). Moreover, the Court explained that “the

standard for specificity in a challenge to submissibility raised in a motion for

directed verdict ‘is not a demanding one.’” Id. (quoting Tharp v. St. Luke's

Surgicenter-Lee's Summit, LLC, 587 S.W.3d 647, 654 (Mo. banc 2019)).

Emphasizing how lenient the standard is, the Supreme Court in Sanders v. Ahmed,

364 S.W.3d 195 (Mo. 2012), held that the following constituted a sufficient oral

directed-verdict motion: “‘We think plaintiff failed to make a submissible case on
issues of negligent causation . . . .’” Id. at 208.

 19
 In this case, argument on the City’s motions for directed verdict, based on

lack of exhaustion, continued for pages and pages of the trial transcript, both at the

close of Williams’ evidence, and after the City had presented its case and the

evidence was closed. I have included in an Appendix to this opinion excerpts of the

City’s argument on exhaustion issues at the close of the evidence. This lengthy on-

the-record argument is obviously sufficient to preserve the exhaustion issue (and

notably, Williams never argued in response that exhaustion was not properly

pleaded in the City’s First Amended Answer). The City’s detailed arguments must

also be construed in light of all that preceded them, where the City had raised the

exhaustion issue not only in its First Amended Answer, but in discovery and

dispositive motions, in a motion in limine, at the outset of Williams’ trial testimony,

and repeatedly with respect to the testimony of other witnesses. Given the City’s

detailed arguments, I do not know what standard of specificity the majority intends

to apply; but I would respectfully suggest that it would be impossible for defense

counsel – in the midst of trial – to ever satisfy it.

 Williams also argues that the City failed to prove its failure-to-exhaust

defense, because it failed to present evidence at trial concerning the manner in

which the Missouri Commission on Human Rights actually interpreted and
investigated his claim, or concerning the manner in which the City construed and

responded to his complaint. Such evidence was unnecessary, however. The caselaw

discussed at length above makes clear that the adequacy of an administrative

charge is determined by reviewing the terms of the charge itself, and comparing the

charge to the allegations a plaintiff seeks to prosecute in litigation. Because

Williams’ original and amended complaints were admitted in evidence, the City

presented all of the evidence which the circuit court needed to resolve the

exhaustion issue, and Williams cites no authority holding otherwise.

 20
 2.
 Although the majority concludes that the City failed to properly plead an

exhaustion defense, and therefore failed to preserve its exhaustion arguments for

appeal, the majority opinion contains extended (and completely unnecessary)

dictum addressing the exhaustion issue on the merits. Thus, the majority contends

that Williams’ administrative complaint is “virtually identical in substance” to the

charge in Alhalabi v. Missouri Department of Natural Resources, 300 S.W.3d 518

(Mo. App. E.D. 2009), where the Eastern District found that a hostile work

environment claim was adequately exhausted. Maj. Op. at 20.

 Williams’ administrative charge is not comparable to the charge in Alhalabi.

In that case, Alhalabi filed an administrative charge which stated:

 [Employer] has recently reprimanded me twice, though it did not have
 cause for either reprimand. These reprimands were made in the
 attempt to unlawfully terminate my employment based upon my race,
 color, religion, national origin, and because of my previous complaints
 about discrimination against me and others in the office.
 My supervisor, Scott Totten, has made false accusations against me in
 a recent performance evaluation. In this fabricated document, he
 claims that I have performed poorly in various areas, and alleges
 several specific deficiencies he knows to be patently false. Mr. Totten
 has recently ordered me to draft an “action plan” in which I am to
 respond to his fabricated evaluation with specific ways to resolve his
 alleged deficiencies. This was also done with the intent of
 manufacturing reasons to terminate me. Mr. Totten has done all of
 these things, in the hopes of terminating me because of my race, color,
 religion and national origin, as well as because of my previous
 complaints.
 Since complaints about discrimination, I have been more harshly
 targeted and disciplined as a result of my complaints.
Id. at 525-26.

 The Eastern District held that this administrative complaint adequately

alleged a hostile work environment claim, based on four features of the charge.
First, Alhalabi “checked the box on the Charge of Discrimination form signifying the

 21
discriminatory conduct was continuing.” Id. at 526. Second, he “listed a span of

over two years, from January 1, 2003 until March 3, 2005, as the ‘date’ on which the

discrimination took place.” Id. Third, Alhalabi described two reprimands and a

false allegation in a performance evaluation that were motivated by the desire to

discriminate against him or to retaliate against him for previous complaints.

Finally, he made general allegations “allud[ing] to previous complaints” about

discrimination against him and others; in addition, Alhalabi stated that, since his

complaints, he had been “more harshly targeted and disciplined.” Id.

 Based on these features of Alhalabi’s administrative complaint, the Court

concluded that, “[u]nlike in cases where there was a discrete act of discrimination,

Alhalabi's Charge of Discrimination describes pervasive racially discriminatory

conduct” that would put the employer on notice that he was making a hostile work

environment claim, and would lead the Commission to investigate such a claim. Id.

at 526 (emphasis added).

 Williams’ charge is much narrower than Alhalabi’s. Williams’ charge

describes only a specific type of alleged unlawful conduct by his employer: denial of

access to training opportunities. Unlike in Alhalabi, Williams did not allege

“pervasive racially discriminatory conduct,” and made no general allegation of
racial discrimination or retaliation directed at him during the five-month timeframe

identified in his charge.

 Unlike in Alhalabi, there is no basis to conclude in this case that an

administrative investigation would reasonably be expected to extend from the

denial of training opportunities described in Williams’ charge, to include an alleged

multi-year campaign of harassment taking multiple different forms (disparaging

comments, unfounded discipline, undesirable work assignments, denial of necessary

equipment or information, etc.), and going well beyond the time period Williams
himself identified. As the Supreme Court explained in Farrow, Williams’ “charge of

 22
discrimination contains no allegations whatsoever that would put [the City] on

notice that [he] intended to raise additional claims” involving aspects of his work

life beyond access to training opportunities. 407 S.W.3d at 594. “The first time [the

City] was apprised of this claim was in [Williams’] . . . petition.” Id.

 3.
 The majority also contends that, in assessing whether Williams exhausted a

hostile work environment claim, this Court must consider an earlier administrative

complaint which he filed in 2014.

 On May 6, 2014, Williams filed a Charge of Discrimination with the Missouri

Commission on Human Rights against the City. Williams’ 2014 charge alleged that

a letter of reprimand which he received on October 9, 2013, was racially motivated,

and was intended to retaliate against him for his earlier support of another

employee’s discrimination complaint. The 2014 charge described the particulars as

follows:

 In or about July 2013, I signed a statement regarding a complaint of
 race[-]based discrimination filed by a former Superintendent. On or
 about October 9, 2013, I, and one other black Maintenance Electrician,
 was issued a letter of reprimand after being observed sitting in our
 vehicle from 10:00 AM to 10:45 AM on or about September 19, 2013.
 I believe I was issued the letter of reprimand because of my race
 (black), and in retaliation for participating in the protected activity of
 writing a statement in support of another person’s complaint of
 discrimination, in violation of Title VII of the Civil Rights Act of 1964,
 as amended.
When asked on the charge form to identify the “Date(s) Discrimination Took Place,”

Williams identified both the “[e]arliest” and “[l]atest” date of the challenged conduct

to be “10/9/2013” – the same day. Williams’ 2014 complaint concerns the incident of

“unfair discipline when [Williams] was attempting to fix the megger” which was

referenced in the verdict director for his hostile work environment claim.

 23
 The Commission investigated Williams’s 2014 complaint. On June 6, 2014, it

issued Williams a “Notice of Termination of Proceedings,” advising him that the

Commission “lack[ed] jurisdiction over this matter because your complaint was not

filed within 180 days of the alleged discrimination as required by the [MHRA].”

The Commission stated that it was “administratively closing this case and

terminating all MCHR proceedings relating to your complaint.” The Notice advised

Williams that he could appeal the Commission’s determination “by filing a petition

under § 536.150 of the Revised Statutes of Missouri” in the Circuit Court of Cole

County. Williams did not seek judicial review.

 The 2014 charge is not relevant for defining the scope of Williams’ more

recent administrative complaint. The 2014 charge was filed seventeen months

before the original complaint at issue here. Williams’ May 2014 charge complained

of a single act, occurring on a single day: the City’s issuance of a letter of reprimand

on October 9, 2013, based on the City’s assertion that he was sitting in his vehicle,

not working, for forty-five minutes on September 19, 2013. Moreover, because no

right-to-sue letter was ever issued based on the May 2014 complaint, the act

complained of in Williams’ untimely 2014 charge is not itself actionable. See, e.g.,

State ex rel. Dalton v. Mo. Comm’n on Human Rts., 618 S.W.3d 640, 651 (Mo. App.
W.D. 2020) (“[T]he Act does not give a claimant an automatic right to sue; the

claimant must first obtain a right-to-sue letter from the MCHR.”).

 The majority contends that Williams’ 2015 charge “incorporated his

allegation of racial discrimination from the 2014 charge.” Maj. Op. at 3. It does

nothing of the sort. The relevant paragraph of Williams’ 2015 charge states:

 III. I believe this is discrimination against me because of my race,
 black, in violation of Title VII of the Civil Rights Act of 1964, as
 amended, and retaliation against me for opposing acts made unlawful
 under Title VII of the Civil Rights Act of 1964, as amended.

 24
This paragraph makes no reference to the May 2014 complaint, or to the events

underlying the May 2014 charge, either explicitly or by implication. In the quoted

statement Williams merely alleged what he contended was the motivation for “this”

– namely, the denial of training opportunities described in the preceding paragraph.

The quoted paragraph did not somehow allege or even suggest additional acts of

discrimination or retaliation, beyond what is described in Paragraph II.

 Further, Paragraph III of Williams’ 2015 charge is too vague to put the City,

or the Commission, on notice of additional alleged acts of discrimination or

retaliation. The charge does not state what the earlier unlawful “acts” which he

opposed were, or what he did to “oppos[e]” them. The earlier acts “made unlawful

under Title VII” could have been acts of discrimination based on “race, color,

religion, sex, or national origin.” 42 U.S.C. § 2000e-2(a)(1). Moreover, the earlier

unlawful acts which Williams opposed were not necessarily directed at him: the

MHRA prohibits an employer from retaliating against an employee for opposing

unlawful acts directed at others, not just against the employee himself or herself.

§ 213.070.1(2); see, e.g., Walsh v. City of Kansas City, 481 S.W.3d 97, 105 (Mo. App.

W.D. 2016). This case offers a paradigm example: Williams alleged in his 2014

complaint that the City retaliated against him after he engaged in the protected
activity of supporting another employee’s discrimination claim. Thus, Williams’

claim of retaliation in his 2015 charge does nothing to suggest that he had

previously been subjected to, or complained of, (1) racial discrimination (2) directed

at him. In particular, Williams’ 2015 charge does not allege that he was being

retaliated against for filing his 2014 charge, or that he was being retaliated against

based on the same underlying protected activity (supporting another employee’s

race-discrimination complaint) which allegedly resulted in his October 2013

reprimand.

 25
 The majority’s “incorporation by reference” claim is no more accurate than

the circuit court’s assertion that Williams’ administrative charge actually alleged all

of the claims of mistreatment which were ultimately included in the verdict

directing instructions. We must decide this case based on what Williams’

administrative complaint actually said, not on what we may wish it had included.

 Even if Williams’ 2015 charge had specifically described the protected activity

allegedly motivating the City’s retaliation, such a claim of retaliation would not

have put in issue the underlying discriminatory acts which Williams previously

opposed. See, e.g., Duncan v. Delta Consol. Indus., 371 F.3d 1020, 1026 (8th Cir.

2004) (where employee’s administrative charge “alleg[ed] retaliation for having

complained about sexual harassment,” “the reference to past harassment is simply

insufficient to put the EEOC or [her employer] on notice of [a sexual harassment]

charge”), overruled on other grounds by Torgerson v. City of Rochester, 643 F.3d

1031 (8th Cir. 2011) (en banc)); Shannon v. Ford Motor Co., 72 F.3d 678, 685 (8th

Cir.1996) (mere reference to previous discrimination charge in subsequent

retaliation complaint “was not enough to exhaust, for Title VII purposes, the

discrimination claim”); Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 222–

23 (8th Cir. 1994) (same).
 The current charge and the May 2014 charge challenge completely different

actions by the City: the 2014 charge challenges a letter of reprimand which

Williams contends was unfounded, while his current charge challenges the denial of

training opportunities to African-American electricians generally. It is not the case

that, whenever an employee files an administrative complaint, every prior charge of

discrimination or retaliation which that employee has ever filed is somehow

implicated or resurrected. Without some reference in Williams’ current complaint

to the May 2014 charge, or to the incident underlying the May 2014 charge, that

 26
untimely, closed complaint has nothing to do with the exhaustion question before

this Court.

 Finally, even if this Court were to consider Williams’ May 2014 charge in

combination with the charge which is actually in issue here, that would still not

allege a hostile work environment claim. Looking at the charges together, they

would simply allege that Williams and other African-American electricians had

been denied training opportunities, and that – on a single occasion more than a year

earlier – Williams had been reprimanded for spurious reasons. Under the caselaw

described above, those allegations would not state a claim for a “hostile work

environment,” even considered in tandem.

 The majority suggests that, at oral argument, the City’s counsel conceded

that if the 2014 charge had actually been incorporated verbatim into Williams’

current charge, then the City’s exhaustion arguments would necessarily be

defeated. Maj. Op. at 16, 21-22. But that is not what counsel said. As the

quotation in the majority opinion reflects, counsel merely stated that, if the 2015

charge had in fact repeated the allegation of retaliation from the 2014 charge, then

the City would not be contending that the re-alleged claim of a retaliatory

reprimand was not exhausted. This is simply a tautology: “if the 2015 charge had
said ‘X’, we would not be arguing that the 2015 charge did not say ‘X.’” Moreover,

immediately following the statement the majority quotes, counsel went on to

explain that Williams’ hostile work environment claim went well beyond any acts

alleged in the 2014, 2015 and 2016 charges. Counsel explained that

 [in] the verdict director for hostile work environment claim [Williams]
 includes a number of disjunctives, such as unfair discipline, sleeping
 on the job, treating as if incompetent, giving undesirable work
 assignments – none of those were mentioned in 2014 other than the
 discipline. . . . I had to work only in the secondary plant, and I didn’t
 get access to parts – none of those relate back to the 2014 [charge] . . . .
 [T]he City wasn’t on notice of those prior to the petition being filed.

 27
Oral Arg. Recording 15:04-15:33. The City did not concede that any “incorporation

by reference” of the 2014 charge would defeat its exhaustion defense.4

 4.
 The majority also highlights the fact that Williams checked the “Continuing

Action” box on the Charge of Discrimination form in both his original 2015 charge,

and in his 2016 amended charge. Checking this box put the Commission and the

City on notice that Williams was relying on the “continuing violation” theory.

Under that theory, “a plaintiff may pursue a claim for an event that occurred prior

to the 180-day statute of limitations for filing a claim of discrimination with the

MCHR if the plaintiff can demonstrate that the event is ‘part of an ongoing practice

or pattern of discrimination’ by the employer.” Tisch v. DST Systems, Inc., 368

S.W.3d 245, 252 (Mo. App. W.D. 2012) (quoting Pollock v. Wetterau Food Distrib.

Grp., 11 S.W.3d 754, 763 (Mo. App. E.D. 1999)).

 There are several problems with the majority’s reliance on the “continuing

violation” doctrine. First, this doctrine was developed to extend the statute of

limitations beyond the 180-day limitations period, where events inside and outside

the limitations period are part of an ongoing pattern of discrimination. But the City

does not argue on appeal that Williams’ hostile work environment claim is barred

by the statute of limitations. Instead, it argues that Williams failed to exhaust his

administrative remedies with respect to the hostile work environment claim,

4 The majority also suggests (Maj. Op. at 17-18), that the City somehow conceded that
Williams’ 2014, 2015, and 2016 charges sufficiently alleged a hostile work environment
claim when it alleged in its First Amended Answer that the 2014 charge “raises similar
issues” to Williams’ later administrative complaints. LF 62, at 15 ¶ 79.b. The quoted
passage merely asserts, however, that Williams’ circuit-court petition makes similar
allegations as his 2014 charge, as a basis for arguing that the claims in the petition were
time-barred. Thus, the City was arguing that, to the extent Williams’ petition repeated
allegations from the 2014 charge – which the Commission had found to be time-barred –
then the allegations of the petition were likewise time-barred. This single, isolated
allegation in the City’s First Amended Answer did not somehow concede away the
exhaustion arguments the City has repeatedly asserted, time and time again.

 28
because his charge of discrimination failed to notify the Commission or the City of

such a claim. The “continuing violation” doctrine is applied to determine the

timeliness of the claims alleged in a complaint or pleading, not to gauge the legal

sufficiency of those allegations. The “continuing violation” doctrine has little to say

concerning how an administrative charge should be interpreted, or whether the

allegations of a particular charge are sufficient to provide reasonable notice.

 In addition, the 2015 and 2016 charges specifically describe the “continuing

violation” Williams was challenging: the discriminatory and retaliatory denial of

training opportunities. Williams’ amended charge is explicit: it alleges that the

City was engaging in “a clear pattern and practice . . . of permitting White

employees to receive better training than African-Americans, that would put the

White employees in a better position for promotion.” The original and amended

charges did not allege any broader pattern of racially motivated discrimination, as

the majority suggests.

 The reason why Williams invoked the “continuing violation” doctrine is self-

evident. Williams filed his original charge on October 2, 2015. The charge alleged

discrimination and retaliation dating back to November 2014 – outside the 180-day

limitations period specified in § 213.075.1. While Williams’ charge may have
alleged that the denial of training opportunities constituted an ongoing “pattern and

practice” extending beyond the 180-day limitations period, nothing in Williams’

charge would have alerted a reader that he was contending that other actions taken

by the City were part of this “pattern and practice.”

 To successfully invoke the “continuing violation” doctrine, an employee must

show that earlier and later acts are “part of ‘a series of interrelated events, rather

than isolated or sporadic acts of intentional discrimination’”; the acts must be

“‘closely-related [and] similar.’” Tisch, 368 S.W.3d at 252, 254 (quoting Pollock, 11
S.W.3d at 763). Williams’ claim that all African-American electricians were

 29
repeatedly denied training opportunities is not “closely-related” or “similar” to his

claims that he was subject to unfounded discipline, unfavorable work assignments,

disparaging comments, or the other acts which he contends established a hostile

work environment. These acts cannot be deemed “closely-related” or “similar”

merely because they all allege race-based discrimination and retaliation – more

than a common discriminatory or retaliatory animus is necessary to distinguish

between “‘a series of interrelated events’” and “‘isolated or sporadic acts of

intentional discrimination.’” Tisch, 368 S.W.3d at 252 (quoting Pollock, 11 S.W.3d at

763).5 Further, Tisch holds that the “continuing violation” doctrine cannot be

invoked with regard to “discrete acts” which “can be ‘identified individually as

significant events,’” and which “occur at a particular moment in time” – “even when

[those discrete events] are related to acts alleged in timely filed charges.” 368

S.W.3d at 253-54 (citations omitted). Many of the acts on which Williams relies to

support his hostile work environment claim constitute such “discrete acts.”

Accordingly, those acts cannot form part of a “continuing violation,” even if those

other events were otherwise “related” to the denial of training opportunities.

 * * * * *
 The City’s first Point is meritorious: Williams failed to exhaust his hostile

work environment claim by filing a timely administrative complaint with the

Missouri Commission on Human Rights, and the City was accordingly entitled to

judgment as a matter of law on that claim.

5 See also Jones v. City of Allen Park, 167 Fed. Appx. 398, 405 (6th Cir. 2006)
(rejecting plaintiff’s argument “that the five allegedly retaliatory actions are not isolated
incidents because they were all motivated by the same animus”); Stoller v. Marsh, 682 F.2d
971, 975 (D.C. Cir. 1982) (“a series of allegedly discriminatory actions against the same
employee, even with the same alleged motive such as sex discrimination, is not enough” to
invoke the “continuing violation” doctrine).

 30
 II.
 In Point II, the City contends that the circuit court erroneously permitted

Williams to submit claims of retaliation to the jury which he had not exhausted.

 As explained above, Williams’ original and amended charges of

discrimination complain only that he was denied certain training opportunities.

Williams alleged both that the denial of these training opportunities was based on

his race, but also that it was in “retaliation against me for opposing acts made

unlawful under Title VII of the Civil Rights Act of 1964, as amended.”

 Thus, Williams plainly exhausted the claim that he was denied training

opportunities in retaliation for opposing discrimination by the City. But the circuit

court permitted Williams – over the City’s express objection – to submit acts of

alleged retaliation which went much further. The verdict director asked the jury

whether the City had retaliated against Williams by

 − “[t]reat[ing] [him] as if he were incompetent”;
 − “[d]en[ying] [him] promotions to the Electrical Maintenance Supervisor
 positions that were awarded to James Crawford and/or Cornell
 Ragland”;
 − “[a]ccus[ing] [him] of not completing or performing work in an
 unsatisfactory manner”; and
 − “[a]ccus[ing] [Williams] of sleeping on the job.”
These allegations of retaliation were never mentioned in Williams’ administrative
complaint. These allegations – of disparaging treatment, unfounded accusations of

poor work and misconduct, or denial of promotions to positions having nothing to do

with the Industrial Motor Controls training course – are not related to Williams’

charge that he was denied specific training opportunities. Nor would the

Commission’s investigation of Williams’ administrative complaint reasonably be

expected to encompass these wholly dissimilar claims. Williams was required to

separately exhaust these distinct retaliation claims. See Tisch, 368 S.W.3d at 254

(“Each incident of discrimination and each retaliatory adverse employment decision

 31
constitutes a separate actionable ‘unlawful employment practice’”; citation

omitted).6

 “‘[F]or disjunctive verdict directing instructions to be deemed appropriate,

each alternative must be supported by substantial evidence.’” Kader v. Bd. of

Regents of Harris-Stowe State Univ., 565 S.W.3d 182, 186 (Mo. 2019) (quoting Ross-

Paige v. St. Louis Metro. Police Dep’t, 492 S.W.3d 164, 172 (Mo. 2016)). If one or

more of the disjunctive alternatives submitted to the jury are legally defective, a

verdict based on that instruction must be reversed. Griffin v. Kansas City So. Ry.

Co., 965 S.W.2d 458, 460-61 (Mo. App. W.D. 1998) (reversing plaintiff’s verdict and

remanding for new trial, where one of the disjunctive submissions of negligence was

preempted by federal law).

 In this case, the disjunctive submissions concerning alleged retaliatory

actions which had not been exhausted should not have been submitted to the jury.

The City is entitled to a new trial on Williams’ retaliation claim, in which

retaliation is submitted solely with regard to the City’s denial of training

opportunities to Williams.

 In discussing the City’s third Point, the majority suggests that the City

offered a form of retaliation instruction (proposed Instruction H) which included the
same disjunctives about which it now complains. Maj. Op. at 28. What the

majority fails to acknowledge, however, is that the City first offered Instruction G as

an alternative to Williams’ proposed verdict director. Proposed Instruction G

hypothesized only a single act of alleged retaliation: that “Defendant denied

6 As with a hostile work environment claim, see note 3 above, evidence concerning
unexhausted acts of alleged retaliation may well have been admissible as “background
evidence” to establish the City’s retaliatory motivation for denying Williams training
opportunities. Tisch, 368 S.W.3d at 254. Tisch specifically holds, however, that such
“background” acts should not be included in a verdict directing instruction: “[t]here was
nothing to submit to the jury on the prior untimely discrete discriminatory acts because
they were no longer actionable.” Id. 257 (citation omitted).

 32
Plaintiff the opportunity to attend the 2014-2015 pilot electrical training class.” It

was only after that instruction was refused by the court, that the City offered an

alternative verdict director (proposed Instruction H), which included all of Williams’

claimed acts of retaliation, but proposed other alternative language. By submitting

proposed Instruction G, the City preserved its objection that only a single alleged

act of retaliation had been exhausted and should be submitted to the jury.

 Williams suggests that the City has failed to establish that it was prejudiced

by the disjunctive submission of multiple, unexhausted incidents of alleged

retaliation. But the submission of disjunctives which are not capable of sustaining

a verdict establishes prejudice requiring a retrial on its own, since “there is no way

of discerning which theory the jury chose.” Kader, 565 S.W.3d at 187 (citation

omitted). In Kader, the Missouri Supreme Court reversed MHRA verdicts for a

plaintiff-employee where the Court concluded that one of four alleged acts of

discrimination and retaliation was unsupported by the evidence. Id. at 190.

Similarly, in Ross-Paige, 492 S.W.3d 164, the Supreme Court reversed an MHRA

judgment, and ordered a retrial, where one of seven submissions of alleged

retaliation was unsupported by substantial evidence. The Court explained that

reversal was required because “this Court cannot rule out the possibility that the
jury improperly returned its verdict upon a theory that was not supported by

substantial evidence and that misdirected or confused the jury.” Id. at 176.

 Here, four of five (or 80%) of the alleged retaliatory actions submitted to the

jury were defective. This is sufficient to establish prejudicial error requiring a

retrial. Indeed, it is unclear what further showing of prejudice the City could

conceivably make, given that inquiry into the jury’s deliberations is not authorized

in these circumstances. See Smith v. Brown & Williamson Tobacco Corp., 410

S.W.3d 623, 642-43 (Mo. 2013).

 33
 Conclusion
 Because Williams failed to exhaust his hostile work environment claim, and

failed to exhaust four of the five instances of alleged retaliation which were

submitted to the jury, the judgment must be reversed. The case should be

remanded for retrial solely on the one claim of retaliation which Williams actually

alleged in his administrative complaint: that he had been denied access to training

opportunities in retaliation for previously opposing acts of discrimination.

 Alok Ahuja, Judge

 34
 APPENDIX
Excerpts of the City’s argument at the close of the evidence on its motion
for directed verdict on the basis of exhaustion.
 MR. ERTZ[, Counsel for the City]: The City will proceed as it
 did again on Friday, I'll address the alleged claim of race
 discrimination and alleged claim of hostile work environment. Mr.
 Kassen will address the retaliation claim Mr. Williams brings into the
 case. So the City renews its motion for directed verdict to the same
 extent it raised it on Friday afternoon and supplemented it this
 morning with reference to the Code of State Regulations. And in this
 case the City moves for directed verdict on Mr. Williams' claim of race
 discrimination for a number of reasons, including the failure to
 exhaust administrative remedies under the Missouri Human Rights
 Act as required under Section 213.075 and 213.111.
Tr. 967:18-968:5.
 [Mr. Ertz:] . . . I think the Exhibits 202 and 203 constitute Mr.
 Williams' charges that are applicable in this case, that 202 is the
 charge of discrimination and 203 is the amended charge of
 discrimination. The City maintains again that nothing has been
 exhausted beyond the motor control course or the electrical course,
 whatever one wants to call it. And I think Mr. Williams' testimony
 during the City's offer of proof establishes that fact. Additionally for
 the –
 THE COURT: Mr. Who?
 MR. ERTZ: Mr. Williams' testimony during the City's offer of
 proof outside of the presence of the jury we took on, I think, Thursday
 establishes that fact. We don't believe there are any other adverse
 employment actions that are adequately pled in this case beyond a
 promotion or an alleged promotion to a position of utility electrician,
 which we do not – which this court has received evidence in this case
 that no such position actually ever existed within the City and still
 does not exist to this day. And the City should be granted directed
 verdict on that as it is pled in Plaintiff's petition for damages. And we
 believe, I guess addressing Exhibit 203, the only thing that is pled in –
 or the only thing included within that amended charge of
 discrimination which was filed October 7, 2016, is the course and – the
 motor control electrical course and the utility electrician position. And,
 again, we've made those arguments that the utility electrician position
 did not exist within the City. For those reasons we don't believe
 anything is exhausted.
Tr. 969:11-970:15.

 35
 MR. KASSEN[, Co-Counsel for the City]: Your Honor, the
 Plaintiff pleads retaliation in addition to the racial discrimination and
 hostile work environment claim in the petition. Retaliation requires
 three elements, protected activity under 213.070, RSMO. Second
 element, an adverse employment action . . . . And thirdly, third
 element for retaliation under the MHRA is a causal connection
 between the first and second elements. The only retaliation claim
 must be pleaded and exhausted.
Tr. 972:1-973:10.
 [Mr. Kassen:] . . . So understanding the City's position on the
 protected activity after the class was offered, the only thing that
 Exhibits 202 and 203 could potentially meet adverse employment
 action that followed that protected activity is a utility electrician
 position and the failure of the City to enroll him in any other course or
 in the industrial motor course going forward. Okay? And the City for
 the first one, the utility electrician position, City would urge that that
 claim has been abandoned. There has been no evidence that that was
 ever a position of the City.
Tr. 980:8-18.
 MR. KASSEN: City wants to remind the Court that there is no
 – there is no exhausted or pleaded claim of a denied promotion to
 anything but the utility electrician position, which was – never existed.
 So these are not – these cannot be the basis for adverse actionable
 retaliation if they are not pleaded promotions.
 THE COURT: Hang on a minute. Maybe we are looking at the
 wrong – he says right here that it would put the white employees in a
 better position for a promotion to deny the black employees and to
 allow these white guys this access to this training course. Right? That
 is the last line in Exhibit 203. That they would be given a more
 favorable position on future promotions.
 MR. KASSEN: I agree that the charge says that, Your Honor.
 THE COURT: Did you know that? Did the City have notice
 that that was his allegation?
 MR. KASSEN: Yes, Your Honor. And denied promotions are
 discrete act under the Tish [sic] case. And the Morgan versus Morgan
 United States Supreme Court case on which Tish [sic] relies. But,
 again, there is no pleading of what notice the City had about what
 promotion he was talking about in the charge or in the petition. He
 specifically says utility electrician. He is putting that –

 36
 THE COURT: I think that's the term that the City was talking
 about and promising at that time. Right? Wasn't there a move afoot to
 create a new position called utility electrician?
 MR. KASSEN: Your Honor, there was a desire, I think the
 testimony is in there that there was –
 THE COURT: Yeah, that's what I thought.
 MR. ERTZ: It's in the trial.
 MR. KASSEN: Your Honor, there is evidence of utility
 electrician or desire to have a utility electrician position that never
 existed. What Your Honor brought up about Mr. Crawford was an
 electrical supervisor position.
 THE COURT: Right.
 MR. KASSEN: Which does not appear anywhere in the charge,
 anywhere in the petition which the Court has judicial notice of. Okay,
 so if a conclusory, denial of this class would put me in a worse place for
 promotions puts the City on notice of anything, it's only the promotion
 that he lists then in that same charge and in that – in his petition
 which is a position that never was. And it's far different experience as
 evidence has shown.
Tr. 984:4-986:2.
 MR. KASSEN: So – and I would also – on the second prong of
 the retaliation claim, adverse employment action, in addition to the
 lack of any second training class not being an adverse employment
 action, City would contend that even the evidence of treatment Mr.
 Williams complained about that is unexhausted and unpleaded, even
 that that followed his complaint about the course does not amount to
 an adverse employment action. It was largely based on I had a third-
 level supervisor disagreement with my work, asking me where the
 park – whether I was going to order a part. It had – it was basically –
 the City would contend it was regular business management between
 supervisor and employee. And so for that reason there is no adverse
 employment action or substantial evidence of that following any
 actionable protected activity. And nor can any constructive discharge
 or allegedly hostile work environment occur or satisfy that adverse
 employment action for retaliation because neither one of those is
 charged or pleaded. And so that goes to those actions, constructive
 discharge and hostile work environment also couldn't satisfy any racial
 discrimination claim in this case.
 THE COURT: Okay. What else? So are you saying now that
 you believe that what Farrow holds is that a employee must plead with
 really specificity of an attorney, of a licensed attorney when they file a

 37
 charge of discrimination, or the door is slammed on them because it's
 not covered by the charge, is that your claim?
 MR. ERTZ: No, we are not making that – I think we agree with
 the court that it could be like or reasonably related to what is in a
 charge of discrimination. But then there is still these standard
 pleading requirements for a petition for damages that when an
 attorney pleads that has to include the claims with ultimate facts upon
 which there is substantial evidence.
 THE COURT: I misunderstood. I thought all this was – you
 were claiming it's just inadequately complained of in the EEO charge.
 In the MCHR charge.
 MR. ERTZ: We do believe there are portions of it, I think
 especially from what Mr. Williams testified to which we maintained in
 our motion for summary judgment and our partial summary
 judgement and the offer of proof is he, I think, conceded that there was
 no hostile work environment or harassment included.
 THE COURT: He conceded there was no –
 MR. ERTZ: He testified that there was no hostile work
 environment or harassment mentioned in his charge of discrimination
 or amended charge. We have the testimony in the record for that. And
 so I guess our point is if the Plaintiff himself doesn't believe it is
 included in there –
 THE COURT: I thought he checked the box that said
 retaliation. Maybe the City doesn't read those boxes, but I think lay
 people do.
 MR. ERTZ: And so my point was to harassment and hostile
 work environment, was what I was saying. I know he checked the box
 for retaliation. I know he checked the continuing violation box. And I
 know he checked the race box. We don't dispute any of those. But we
 do dispute there is sufficient statements within the charge of
 discrimination or amended charge of discrimination to bring about a
 hostile work environment claim.
Tr. 986:19-989:6.

 38